IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ADELLE GOODWINE

Plaintiff,

-against-

THE CITY OF NEW YORK, NEW YORK
CITY DEPARTMENT OF INFORMATION
TECHNOLOGY & TELECOMMUNICATION,
PAUL CONSGRAVE, RONALD BERGMANN,
CORDELL SCHACHTER, VINCENT GRIPPO,
AND CAROLE POST, in their official and
individual capacities,

Defendants.

Case No. 15 CV 2868 (JNF) (SN)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## OPPOSITION TO DEFENDANTS MOTION TO DISMISS THE COMPLAINT

J. Patrick DeLince
DELINCE LAW PLLC
(Bar Roll No. JD5795)
299 Broadway, Suite 1310
Tel:  212 382-3455
Fax: 212 504-8221
jpd@delincelaw.com
Attorney for Plaintiff

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ...................................................................................................... ii

**PROCEDURAL HISTORY** ........................................................................................................1

**PRELIMINARY STATEMENT** ...............................................................................................1

**STATEMENT OF FACTS** ..........................................................................................................2

**LEGAL STANDARD** ................................................................................................................21

## POINT I

### ALL OF PLAINTIFF'S CLAIMS ,AS PLED, ARE TIMELY PLED

A. Plaintiff's Pay Discrimination Claims Under Title VII, Section 1983, NYSHRL and NYCHRL Constitute a Continuing Violation Relating Back to April 2006 .....................................................22

B. Plaintiff's NYSHRL and NYCHRL Claims Were Tolled During the Pendency of Plaintiff's EEOC Complaint and Relate Back to July 24, 2006.................................................................................23

C. Plaintiff's Discrimination, Retaliation and Hostile Work Environment Claims Under Title VII, Section 1983 and 1981 Are Timely ..................................................................................................24

## POINT II

**PLAINTIFF STATES A CAUSE OF ACTION FOR RETALIATION**.............................................27

## POINT III

**PLAINTIFF STATES CLAIMS FOR PROMOTIONAL DISCRIMINATION, COMPENSATION, BASED ON HER RACE AND/OR GENDER AND/OR SEX IN UNDER TITLE VII TO SECTION 1983, SECTION 1981 NYSHRL and NYCHRL**.................................................................................33

## POINT IV

**PLAINTIFF STATES A CAUSE OF ACTION FOR HOSTILE WORK ENVIRONMENT** .........336

## POINT V

**PLAINTIFF STATES VIABLE CLAIMS UNDER THE NYCHRL** ....................................................38

## POINT VI

**PLAINTIFF IS ABLE TO ESTABLISH HER *MONELL* CLAIMS** ...................................................39

**CONCLUSION** ........................................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## United States Supreme Court

*Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) ................................................................21

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 199, 2405, 2420, 165 L. Ed. 2d 345 (2006) ......................................................................................................29

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) ...................................................37

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ......................................38, 39

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002) ..............................25

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)..............................................21

## United State Court of Appeals

*Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ...................34

*Davis v. Bombardier Trans. Holdings*, 794 F.3d 266, 270 (2d Cir. 2015) ...................22

*Castagna v. Luceno*, 744 F.3d, 254 (2d Cir. 2014) ....................................................24

*Chambers v. TRM Copy Ctr. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) ............................34

*Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 44 (2d Cir. 1984) ....................35

*Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) .........................................32

*Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) ..................................................22

*Derrick v. DCM Erectors, Inc.*, 2016 U.S. Dist. LEXIS 11930 (S.D.N.Y. 2016) ........24

*Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) .......................................26

*Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) ...........................................33

*Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 406 (S.D.N.Y. 2014) ...........27

*Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ..........................................27,39

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) .......................................32

*Gregory v. Daly,* 243 F.3d 687, 691–92 (2d Cir. 2001) ..............................................................37

*Groesch v. City of Springfield*, Ill., 635 F.3d 1020, 1026 (7th Cir. 2011) ..................................22

*Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237, 241 (2d Cir. 2007) .........................21

*Krieger v. Gold Bond Bldg. Prods.,* 863 F.2d 1091, 1096–97 (2d Cir. 1988) .......................26, 35

*Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 65 (2d Cir. 1992) .....................28

*Littlejohn v. City of New York*, 795 F.3d 297, 306–11 (2d Cir. 2015) ........................21, 22, 39,40

*McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 75–76 (2d Cir. 2010) .....................................25

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F. 3d 102, 109 (2d Cir. 2013) ........27, 38

*Moccio v. Cornell Univ.,* 889 F. Supp. 2d 539, 592 (S.D.N.Y. 2012) ........................................27

*Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007) ....................................................................37

*Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996) ..........................................24

*Shomo v. City of New York*, 579 F.3d 176, 181 (2d. Cir. 2009) ..................................................26

*Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) .................................................................38

*Treglia v. Town of Manlius,* 313 F.3d. 713, 720 (2d Cir. 2002) ................................................33

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F. 3d 72 (2d. Cir. 2015) ...................................29

*Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) ......................................26

**United States District Court Cases**

*Acosta v. City of New York*, 2012 WL 1506954 (S.D.N.Y. Apr. 26, 2012) ................................27

*Allen v. City of Yonkers*, 803 F. Supp. 679, 701 (S.D.N.Y. 1992) .............................................33

*Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011)……...…………25, 36

*Cortes v. City of New York*, 700 F. Supp. 2d 474, 487 (S.D.N.Y. 2010) .....................................37

*E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 831 (S.D.N.Y. 2013)....................................23

*Esposito v. Deutsche Bank AG*, No. 07 CIV. 6722(RJS), 2008 WL 5233590 (S.D.N.Y. 2008) ...................................................................................................................................................23,24

*Ghaly v. U.S. Dep't of Agric.*, 739 F. Supp. 2d 185, 199 (E.D.N.Y. 2010)..................................29

*Govia v. Century 21, Inc.*, 140 F. Supp. 2d 323, 325 (S.D.N.Y. 2001) ..................................26,35

*Griffin v. N.Y.C. Off-Track Betting Corp.*, No. 98 CIV 5278 RCC, 2002 WL 252758 (S.D.N.Y. Feb. 20, 2002) ........................................................................................................................26

*Hagan v. City of New York*, No. 13 Civ. 1108, 2014 WL 4058067 (S.D.N.Y. 2014) ...........26, 35

*Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 363 (S.D.N.Y. 2006) .....................................28

*Husser v. N.Y.C. Dep't of Educ.*, No. 12-CV-6095 MKB JO, 2015 WL 5774741 (E.D.N.Y. 2015) ...................................................................................................................................................22

*Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) ..................29

*Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 511 (S.D.N.Y. 2010) ...............................21

*Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002)…………………………..22

*Mareno v. Madison Square Garden, L.P.*, No. 98 Civ. 2719, 2000 WL 1401156 (S.D.N.Y. 2000) ................................................................................................................................................26, 35

*Morris v. Lindau*, 196 F.3d 102, 110 (2d. Cir. 1999) .................................................................34

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014) ..............37

*Risco v. McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012) ......................................................33

*Stewart v. City of New York*, No. 11 Civ. 6935, 2012 WL 2849779 (S.D.N.Y. 2012) ................33

*Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 257 (E.D.N.Y. 2012) ..............................33

**New York State Cases**

*Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38 (2009) .......................................................38

**Statutory Provisions**

N.Y. C.P.L.R. § 214(2) ...............................................................................................................23

N.Y.C. Admin. Code § 8–502(d). ..............................................................................................23

Ledbetter Fair Pay Act, 42 U.S.C. § 2000e–5(e) ......................................................................22

42 U.S.C. § 1981 *et seq.* ...........................................................................................24, 25, 33, 37

42 U.S.C. § 1983 *et seq.* .............................................................................22, 24, 25, 33, 37, 39

42 U.S.C. § 2000e *et seq.* .............................................................................................22, 24, 28

## PROCEDURAL HISTORY

Ms. Goodwine began her employment on or about April 3, 2006 and filed her EEOC charge on April 28, 2009. She subsequently amended and/or supplemented the charge on: June 29, 2009; September 3, 2009, August 2, 2010; and May 2, 2012 (*compare* Proposed Second Amended Compl. ¶¶ 5, 14, 44 with First Amended Compl. ¶¶ 5, 185, 224, 225). Ms. Goodwine received her "right to sue letter" on January 16, 2015, more than 5½ years after her initial filing (Compl. ¶ 6). Ms. Goodwine then commenced her action in federal court within 90 days on April 14, 2015 (Compl. ¶ 225). Defendants make their current motion to dismiss in lieu of answering the First Amended Complaint, pursuant to Rule 12(b)(6).

## PRELIMINARY STATEMENT

The Amended Complaint alleges that Adelle Goodwine ("Ms. Goodwine" or "Plaintiff") an African-American, who had over twelve (12) years of public procurement experience, began working at the Department of Information Technology & Telecommunications ("DoITT") on the Emergency Communications Transformation Program ("ECTP") as the Contracts/Budget Administrative Manager, in April 2006, never suspecting that she would discover the agency was rife with discrimination based on race and sex, cronyism and practiced retaliation against those who would oppose or complain about discriminatory practices and inequalities at DoITT. Ms. Goodwine retired in February 2014 on disability retirement. What happened to her during her eight (8) years of employment is the subject of her complaint. Ms. Goodwine was the only female minority manager on the ETCP. Starting in or about October 2006, when DoITT hired a Caucasian Executive Program Manager, Assistant Commissioner Cordell Schachter ("Defendant Schachter"), to whom Ms. Goodwine was then directed to report, and then spreading to management through the acts or omissions of Commissioner Paul Cosgrave ("Defendant

1

Cosgrave"), Acting Commissioner and First Deputy Commissioner Ronald Bergmann ("Defendant Bergmann"), Chief of Staff Vincent Grippo ("Defendant Grippo"), and Commissioner Carole Post ("Defendant Carole Post") and other senior level DoITT employees. Ms. Goodwine was subjected to race and sex discrimination, a hostile work environment, retaliation and intimidation.  Ms. Goodwine filed several complaints with the DoITT's EEO Office which found in 2007 that the Defendant Schachter had retaliated against her. Despite the EEO's internal finding, she continued to be subjected to discrimination and retaliation in her workplace, prompting her to file several EEOC charges starting in 2009.

Defendants' main argument for dismissal focuses on statute of limitations period concerns; however, that argument is unavailing due to the tolling of statutory claims during pendency of the EEOC investigation. Further, although the complaint sets forth violations of various federal, state and city statutory claims, any facts that fall outside particular statutory periods may either by deemed continuing violations or used circumstantially to bolster the factual allegations within the statutory period.  All in all, the complaint details a multiplicity of facts that establish plausibility in order withstand a 12(b)(6) dismissal.  Those facts include specific examples of disparate treatment in terms of her pay, promotion, accommodation and career advancement vis-a-vis identified comparators, along with a litany of examples demonstrating Ms. Goodwine's engagement in protected activity within close proximity to a continuum of retaliatory conduct, as well as a showing of a pattern and practice of discrimination and cronyism favoring Caucasian males and disfavoring African-Americans at DoITT.

## STATEMENT OF FACTS

### April 2006—Disparity in Pay with White Comparators

2

The Amended Complaint alleges that Adelle Goodwine, an African-American woman with a chronic autoimmune condition, Systemic Lupus Erythematosus ("SLE"), commenced employment with DoITT in April 2006, as a Contracts/Budget Administrative Manager (Compl. ¶¶ 12, 13, 14, 44, 45). DoITT is a municipal agency that provides IT services, infrastructure and telecommunications to New York City (Compl. ¶ 19). Her position's single focus was on the Emergency Communications Transformation Program ("ECTP"), a program established to improve the City's 911 response time among its first responders (Compl. ¶ 45).  Ms. Goodwine had twelve (12) years of procurement experience in the public sector and was hired at a starting salary of $80,000 (Compl. ¶¶ 47, 48). Ms. Goodwine was the only female minority manager on the ECTP staff. The ECTP team also consisted of two Caucasian male managers, William Gross and Brent Schmike, both of whom functioned in the same capacity with equal skillsets and complexity in tasks as Ms. Goodwine; both these Caucasian males were paid approximately $20,000 more than Ms. Goodwine. (Compl. ¶¶ 50, 51, 53).

Ms. Goodwine excelled in her position; for example, in 2006 as a result of her audit while on ECTP, she saved the City over $1,000,000 dollars in inappropriate billing (Compl. ¶ 56).

## Disparity in Title with White Comparators

Ms. Goodwine, at the time of her hire and throughout her employment with DoITT, had a permanent civil service title of Procurement Analyst Level III, which provided her with job security and protection from termination without due process. Ms. Goodwine's provisional civil service title at DoITT was "Administrative Manager Level II" (Compl. ¶ 53). Based on her job duties, Ms. Goodwine's provisional title should have been a higher level, such as Administrative Procurement Manager or Computer Systems Manager, comparable with the provisional titles held by her two Caucasian male comparators William Gross and Brent Schmike (Compl. ¶ 53).

3

**August 2006- Discrimination and the Beginnings of a Hostile Work Environment**

In or about July 2006, Michael Lebow, who had assumed some of the responsibilities of Deputy Commissioner Brown upon her resignation (Compl. ¶ 57), completed a Personal Action Request ("iPAR") that requested a provisional title change for Ms. Goodwine to "Administrative Procurement Manager," which would have entitled her to increased compensation and advancement opportunities (Compl. ¶¶ 58, 59). Upon information and belief, Defendant Cordell Schachter, a Caucasian male, was interviewed and selected as an Associate Commissioner and the new ECTP Executive Program Manager to replace Michael Lebow by Defendant Ronald Bergmann, who at the time (in or about April/May 2006) was the "Acting Commissioner of DoITT (Compl. ¶¶ 60-62). Upon information and belief, when Defendant Schachter started on site, he revoked Ms. Goodwine's previously approved provisional title change, while keeping in place the higher level provisional titles for her Caucasian male counterparts at the ECTP (Compl. ¶¶ 64-66).

Michael Lebow expressed his disagreement with Defendant Schachter's revocation of the iPAR to newly appointed Defendant Cosgrave (Compl. ¶ 67). The effect of the revocation was to stunt Ms. Goodwine's advancement opportunities and to deny her pay increases afforded to her Caucasian male counterparts (Compl. ¶ 69). Defendant Schachter demanded that Ms. Goodwine work outside her prescribed duties unlike her male counterparts by managing his personal schedule, driving him around to various City locations, placing his lunch orders, fetching him coffee, and performing other menial tasks for him (Compl. ¶¶ 70, 71). Prior to filing an EEO complaint, Ms. Goodwine complained directly to Defendant Schachter about the tasks he was demanding of her; he threatened retaliation against her by stating: "I am the one that is going to be giving you money. I am the one that is going to approve your pay raises" (Compl. ¶ 72). Ms.

Goodwine informed Schachter that she actually did not directly report to him (Compl. ¶ 73). Upon information and belief, Defendant Cosgrave was informed of Ms. Goodwine's reporting structure by Deputy Commissioner Brown, when Cosgrove was hired, in or about June 2006, and had approved it (Compl. ¶ 74). When Ms. Goodwine informed Defendant Schachter that she did not directly report to him, he convinced Defendants Bergmann and Cosgrave to switch the reporting structure so that going forward Ms. Goodwine would report to him directly while continuing to charge her with menial tasks (Compl. ¶¶ 75, 76).

### November 2006—Reasonable Accommodations, Discrimination and Retaliation

In or about mid-November 2006, Ms. Goodwine fell and tore her posterior cruciate ligament ("PCL"). As a result, she had to wear a full leg brace for a period of time (Compl. ¶ 77). However, when she requested reasonable accommodation to address her increased commute time, Defendant Schachter denied the request (Compl. ¶ 77). Further, unlike the treatment afforded to her Caucasian male comparators, Defendants Schachter and Bergmann requested information about Ms. Goodwine's civil service status and job performance from her previous City agency employer, to determine whether she had job security through a permanent title or they could terminate her outright (Compl. ¶¶ 78, 79, 80). Through the fall of 2006 into 2007, Ms. Goodwine complained internally to EEO officer Dalela Harrison about the discrimination and the disparity she experienced (Compl. ¶ 81).

### November 2006—Continued Pay Disparity

In or about November 2006, Ms. Goodwine learned that her ECTP salary was substantially lower than that of her Caucasian male comparators, who were appointed to higher-level provisional civil service titles despite the fact that Ms. Goodwine's job duties were equal to theirs or required comparable skill, effort, and responsibility (Compl. ¶¶ 81–83). Mr. Gross was

compensated at approximately $21,000 more and Mr. Schachter was paid approximately $20,000 more than she had been (Compl. ¶ 82). Upon information and belief, even Caucasian males below Ms. Goodwine's level on the ECTP team were paid more than she was; for example, Richard Lindermulder, who was hired as a subordinate to Defendant Schmike, was compensated at a higher level than Ms. Goodwine (Compl. ¶ 84). Defendant Schachter recommended to Defendant Cosgrave that the City approve the hiring of Caucasian males for positions at levels lower than Ms. Goodwine, but to pay them substantially more (Compl. ¶ 85). Defendant Schachter also directed that Ms. Goodwine prepare staffing memos for junior staff positions whose budgeted salaries were to be higher than her salary (Compl. ¶ 85).

### November 2006-January 2007—Discrimination, Retaliation, HWE and EEO

Prior to her filing an internal EEO complaint, Defendant Schachter continued to discriminate and retaliate against Ms. Goodwine by beginning to cancel Ms. Goodwine's regularly scheduled one-on-one meetings with him, and became even more dismissive of her role on the ECTP team (Compl. ¶ 86). On or about December 13, 2006, Ms. Goodwine reported to Defendant Bergmann that she and Defendant Schachter had serious issues working together; a week later, on December 21, 2006, she reported that Defendant Schachter was treating her differently from the Caucasian males on the ECTP team (Compl. ¶¶ 87, 88). Defendant Bergmann suggested that she speak with Defendant Schachter, but not to "escalate" matters (Compl. ¶89). On or about January 2, 2007, Ms. Goodwine first spoke to Defendant Schachter about what she believed to be his discriminatory treatment of her; however, his treatment of her only worsened after the conversation (Compl. ¶¶ 90, 91). Throughout the aforementioned period, Ms. Goodwine met with Dalela Harrison, DoITT's EEO Officer, regarding the hostile work environment and discriminatory animus to which she was being subjected. (Compl. ¶ 92).

### January 2007—Plaintiff Files Internal EEO Complaint

On or about January 7, 2007, Ms. Goodwine filed an internal complaint ("Internal EEO Complaint") of discriminatory treatment and hostile work environment based on race and gender with DoITT's EEO Office (Compl. ¶ 93). The basis of the Internal EEO Complaint was the disparate treatment she received from Defendant Schachter as compared to his treatment of Mr. Schmike and Mr. Gross, her white male comparators on the ECTP team (Compl. ¶ 94). Upon being notified of the Internal EEO Complaint, Defendant Schachter began to increase his retaliation against her by (1) deliberately and unreasonably excluding her from critical program and regular team meetings which she previously attended; (2) continuing to reschedule or cancel regularly scheduled one-on-ones, and/or holding Ms. Goodwine's one-on-ones over the telephone rather than in person, a practice Defendant Schachter later admitted he had not previously utilized; (3) excluding her from the ECTP team; (4) becoming unresponsive to Ms. Goodwine's communications; and (5) humiliating Ms. Goodwine in the presence of her Caucasian male peers by shouting at her, ignoring her in team meetings, and disparaging her, all of which created a hostile work environment that exacerbated Ms. Goodwine's health issues, among other negative effects (Compl. ¶¶ 95, 96).

In or about March 2007, Defendant Schachter asked the managers on the ECTP to write up their job descriptions for later review with him (Compl. ¶ 97). Ms. Goodwine utilized the job description from the job posting she was hired to perform, but Defendant Schachter declined to approve these job duties and instead edited her job duties to include administrative tasks such as keeping track of managers' time sheets, invoicing, arranging schedules, and monitoring appointments (Compl. ¶ 98). Defendant Schachter also forbade Ms. Goodwine from performing any more audits on the ECTP, a central responsibility of her position (Compl. ¶ 99). Her most

7

recent audit in the same month concerned the Automatic Vehicle Locator project, a $38,000,000 federally funded contract (Compl. ¶ 99). Upon information and belief, none of her male comparators were downgraded in job responsibility and opportunity; rather, they were given more opportunities, such as pursuing formal project manager accreditation (Compl. ¶ 100). Subsequent to the aforementioned, Ms. Goodwine amended her Internal EEO Complaint to include a claim of retaliation (Compl. ¶ 101).

### April 11, 2007—EEO Investigation Findings & Lack of Remediation

On or about April 11, 2007, DoITT's EEO Office issued a formal determination that substantiated Ms. Goodwine's allegations of retaliation. Specifically, the determination stated that Defendant Schachter "often flagrantly, indicated an unwillingness to comply" with workplace policy and continued to retaliate against her, even after he was specifically advised to cease his retaliatory conduct (Compl. ¶¶ 102, 103). For example, Defendant Schachter had stated that "despite previous EEO recommendations, he would need to consider whether he was willing to be compliant" with the anti-retaliation laws (Compl. ¶ 103). Despite the results of the internal EEO investigation, Defendant Schachter remained in his role as head of ECTP for approximately fourteen (14) more months and DoITT did not enforce any of the EEO corrective action directives (Compl. ¶ 104).

### Goodwine Is Transferred and Functionally Demoted to Another Department

While investigating Ms. Goodwine's Internal EEO Complaint of discrimination and retaliation, DoITT's EEO Officer asked if she would be interested in another job within the agency (Compl. ¶ 105). Ms. Goodwine stated that she would be interested in another job on the condition that the job was comparable to her stated job responsibilities with the ECTP. Those duties were "pivotal ones," because they allowed her to demonstrate her skillset to many

individuals at higher levels of City government, and she viewed the position as a career stepping stone (Compl. ¶¶ 105, 106).

Days after the internal EEO determination, Ms. Goodwine was working on a Saturday and encountered Defendant Cosgrave at the office. Defendant Cosgrave stated that everyone knew that Defendant Schachter had a "tone." Defendant Cosgrave also expressed relief that the EEO investigation did not find that Defendant Schachter had engaged in discrimination. At the end of this conversation, it was clear that Defendant Cosgrave clearly dismissed and disregarded the EEO Office's finding of retaliation (Compl. ¶ 107). Defendant Cosgrave stated that he was making some changes to the agency, including appointing Michael Lebow as the Chief Technology Officer. With the new changes, Defendant Cosgrave went on to say that Mr. Lebow would be provided with a staff and high-profile programs to administer and suggested placing Ms. Goodwine on Lebow's staff (Compl. ¶ 108).

In response, Ms. Goodwine informed Defendant Cosgrave that she had applied for and preferred a position working with Assistant Commissioner for Financial Services John Winker, which she hoped to secure having been interviewed several times (Compl. ¶ 109). Soon thereafter, Ms. Goodwine learned that the position went to a new hire, a Caucasian male (Compl. ¶ 110). Upon information and belief, the selected candidate lacked the "extensive experience directly relevant to the position," which Ms. Goodwine possessed (Compl. ¶ 110).

In or about May 2007, two weeks after the EEO determination, Ms. Goodwine was retaliated against when she was transferred to an unposted, undefined position in the Chief Technology Office ("CTO") under Michael Lebow—which was a functional demotion from her prior position (Compl. ¶ 111). Ms. Goodwine learned about the transfer when she received an email from the Human Resources Department stating: "Confirming your voluntary reassignment

to the office of the CTO. You will be reporting to Michael Lebow." (Compl. ¶ 112). Ms.

Goodwine never volunteered to be reassigned to the CTO; she never interviewed for the position;

there was no job description for the position, nor was the position posted internally or otherwise

(Compl. ¶ 113). Ms. Goodwine had never accepted a position without the benefit of a posting or

written job description or an interview to afford her the opportunity to make an informed

decision regarding her career (Compl. ¶ 114). Ms. Goodwine had never agreed to move and

conveyed this to Human Resources, yet she was sent boxes to pack her belongings and was

involuntarily transferred to the DoITT's 225 Greenwich Street location (Compl. ¶ 115). As the

forced transfer transpired, Ms. Goodwine immediately contacted the EEO Office and conveyed

to the office that she felt the transfer was a functional demotion and done in retaliation for her

complaints of discrimination and retaliation (Compl. ¶ 116).

Forced into the position, Ms. Goodwine was not afforded a raise equal in parity to her

Caucasian male comparators, she received a small salary increase of approximately 4% with the

transfer, but only after she complained to DoITT's EEO Officer about the impropriety of the

transfer (Compl. ¶ 118). Upon information and belief, her 4% raise paled in comparison to the

raises received by her Caucasian male comparators, such as Messrs. Schmike, Gross, and

Lindermulder, who received between 10% and 20% raises and who remained on the ECTP team

(Compl. ¶¶ 119, 120). Moreover, upon information and belief, when Caucasian males at DoITT

are transferred to new positions, they often receive salary increases of 8% or higher (Compl. ¶

121).

When Ms. Goodwine started her new position, there was no formal organization or

budget for the new CTO and no direct staff reporting to her. After a year, however, she

successfully proved her capabilities to Michael Lebow and received an "outstanding"

performance evaluation rating and a small merit increase (Compl. ¶ 122). Subsequent to the increase, Ms. Goodwine's salary was still less than her Caucasian comparators in the CTO and continued to be a retaliatory and discriminatory practice by DoITT, for example, Lisa Lugo ("Lugo") and Sidney Irgang ("Irgang") were both paid approximately $30,000 more; Andrew Casey ("Casey") earned $20,000 more; Samuel Litt ("Litt") was paid approximately $25,000 more; and Anthony Insolnia ("Insolnia") received approximately $43,000 more than Ms. Goodwine. (Compl. ¶ 123). Ms. Goodwine's Caucasian comparators in the CTO had duties and responsibilities comparable to hers yet they received substantially higher salaries (Compl. ¶ 124).

Ms. Goodwine worked hard to manage programs for the CTO. For instance, she was the individual primarily responsible for managing the contracts and budget for the CTO's work on the "NYC Notify" program and the "Big Apps" program, high-profile programs that subsequently won State and City-wide awards for excellence in technology (Compl. ¶ 125). Neither of these awards was internal to DoITT; both awards for her accomplishments were awarded by external City and State entities (Compl. ¶ 126).

### 2007—Disparate Treatment and HWE

Despite these successes, Ms. Goodwine was denied managerial day(s) off for performance recognition, while her CTO Caucasian comparators received such recognition for the same programs/projects in which she was involved (Compl. ¶ 127). While assigned to the CTO in 2007, Ms. Goodwine and Lugo were tasked to work on the CLARITY program with Defendants Schachter and Bergmann (Compl. ¶ 128). Ms. Goodwine was openly humiliated by Defendant Bergmann when, during a meeting with senior level colleagues, Defendant Bergmann told her "your input is not required; no one cares what you think." Further, Defendant Schachter and some of the attending Caucasian male Commissioners laughed, which caused Ms. Goodwine

to leave the meeting distressed (Compl. ¶¶ 129).  Upon information and belief, although Ms.

Goodwine no longer reported to Defendant Schachter, he continued to discriminate, and retaliate

against and disparage her, telling senior level employees at DoITT that she was a "terrible

employee" and "brought no value" (Compl. ¶ 130).  Senior level management at DoITT also

discriminated and retaliated against her by ostracizing and excluding her from meetings and

denying her access to necessary resources. Ms. Goodwine again complained about what she

perceived to be discrimination and retaliation to the internal EEO officer (Compl. ¶¶ 131, 132).

### June 2008—Failure to Promote / EEO Complaint

In or about June 2008, Schachter left DoITT and Ms. Goodwine applied for the position

she held in ECTP prior to her transfer to the CTO. This positon encompassed all of Ms.

Goodwine's former responsibilities and was posted at a salary range of up to $125,000 (Compl.

¶¶ 133, 134). Ms. Goodwine was interviewed for the position by all Caucasian DoITT

employees, Brent Schmike, by then the Acting ECTP Executive Program Manager, Associate

Commissioner Ellen Stein, and Human Resources Recruiting Manager, Mark Hermanson. The

overall tone of the interview was hostile and she was asked questions not asked of the other

candidates (Compl. ¶¶ 135, 136).

Upon information and belief, Carl Geffken ("Geffken"), a Caucasian male, was offered

the position, but declined the offer in or about August 2008. Upon information and belief,

Geffken was less qualified for the position than Ms. Goodwine; her experience was superior in

all repects relevant to the posted job duties and requirements (Compl. ¶¶ 138, 139). After

learning that Geffken had declined the position, Ms. Goodwine contacted Schmike and reiterated

her interest in the position. In response, Schmike said: "Adelle I know you can do the job," but I

would not "put my hat back in the ring," because "the team does not feel you will fit in" (Compl. ¶ 141).

Ms. Goodwine reported Schmike's comments to DoITT's EEO Office because she believed that the exclusion was in retaliation for her internal charges of discrimination and for engaging in protected activity (Compl. ¶ 143). Upon information and belief, Defendant Bergmann did not want her back on the ECTP team, despite her qualifications, and ensured that she was not hired in retaliation for naming former manager and Defendant Bergmann's personal friend, Defendant Schachter, in an internal EEO complaint, and for acting as a resource for other DoITT employees who were similarly discriminated and retaliated against for their membership in a protected class (Compl. ¶¶ 144, 145).

After Geffken declined the offer, and after Ms. Goodwine complained to the EEO office, an African-American female, Michele Agard, was offered the position (Compl. ¶ 146). Ms. Agard later resigned from the position, stating in an email that she did not feel she "fit in" with ECTP, which Ms. Goodwine understood had to do with discriminatory animus toward African-American females (Compl. ¶ 146). Ms. Goodwine was equally, if not more qualified than Geffken and/or Agard for this position, which was essentially the same positon Ms. Goodwine held on the ECTP team and for which she had received praise and accolades (Compl. ¶ 147). Ms. Goodwine had more public procurement and contract administration experience than both Geffken and Agard, and neither of them had received awards in public safety or possessed a public acquisition certification (Compl. ¶¶ 147-149). Throughout 2008, Ms. Goodwine was retaliatorily denied numerous other promotional opportunities and positions for which she was qualified at DoITT. (Compl. ¶ 150).

### 2008— Continued Discrimination and Retaliation

Between June and September 2008, the CTO had two (2) vacancies following the departures of Assistant Commissioner Lugo and Associate Commissioner Irrgang. Ms. Goodwine was well-qualified for either position, in particular she was exceptionally qualified for Lugo's position since they shared comparable responsibilities (Compl. ¶¶ 151, 152). Rather than promote Ms. Goodwine, the CTO organization was reduced to eliminate Ms. Lugo's position and budget, upon information and belief at the direction of Defendant Grippo in his capacity as Chief of Staff. Ms. Lugo's duties and associated budget were reassigned to Grippo's area and a Caucasian employee was promoted to the new position, at a higher salary. (Compl. ¶¶ 153, 154). With respect to the Health and Human Services (HHS) program, DoITT failed to even interview Ms. Goodwine. (Compl, ¶¶ 154, 155). Upon information and belief, a Caucasian male, who had less experience than she and no prior City agency experience, was selected for the HHS position. (Compl. ¶ 156).

### 2009—Grippo and Other Senior Management Discriminate and Continue to Retaliate: Plaintiff Complains to Grippo, Agency Commissioner and EEO

In or about February 2009, Ms. Goodwine became aware that Defendant Grippo told one of her colleagues that Ms. Goodwine should be "careful" and that she would "pay" after her immediate supervisor and only senior level supporter, Lebow left. Ms. Goodwine told Defendant Grippo that she took his comments as a "threat" to her "livelihood" and as unlawful retaliation for her prior complaints of discrimination (Compl. ¶¶ 157, 158). This conversation was shared by Ms. Goodwine with DoITT's EEO Officer and Defendant Cosgrave (Compl. ¶ 158). Ms. Goodwine also told Defendant Grippo that she felt that she was being maligned because she did not "fit in" because she could never be a "white man." Ms. Goodwine again raised her concerns with Defendant Grippo about her functional demotion and discriminatory denial of other opportunities subsequent to her filing Internal EEO Complaints, and that she believed she was

14

being "blacklisted" and blocked in her career (Compl. ¶¶ 159, 160). Ms. Goodwine also

informed Defendant Grippo that Associate Commissioner of Financial Services John Winker

("Winker") had "verbally accosted her" in the presence of her peers when he asked her if she

was "smoking crack." Ms. Goodwine explained that she considered Winker's comment racist

because crack is associated with minority populations. In addition, Ms. Goodwine explained to

Defendant Grippo that she was being referred to as a "cunt" and "bitch" in the workplace by

senior level managers, specifically Deputy Commissioner of Operations Michael Bimonte

("Bimonte"), a Caucasian male, who at the time reported to Bergmann (Compl. ¶¶ 161-163).

Despite Ms. Goodwine's numerous complaints, nothing meaningful was done to address those

hostile, discriminatory, and retaliatory acts (Compl. ¶¶ 164–167).

### 2009—Ms. Goodwine Files a Charge with the EEOC

On or about April 29, 2009, Ms. Goodwine filed a charge of discrimination and

retaliation with the EEOC (Compl. ¶ 167). The First Amended Complaint notes that the EEOC

had issued a probable cause unequal pay finding, based on race and gender on a charge, filed by

Local 1180 (Compl. ¶ 169, footnote 1) Caucasian employees at DoITT had more opportunities

for career advancement, while African-Americans regularly received minimal increases in their

salaries. Further, upon information and belief, DoITT regularly promotes Caucasian employees

giving them increases ranging from 10% to 30%, of their salaries. In comparison, African-

American employees at DoITT generally are denied promotions or receive substantially lower

salary increases, creating disproportionate increases and appointments of Caucasian employees,

even when African-American candidates were similarly situated and in some circumstances held

exactly the same civil service title—creating a pattern and practice of discrimination (Compl. ¶

167). Ultimately, these disparities were so pervasive that they amounted to a pattern and practice of disparate promotional and hiring practices at DoITT.

### 2009—Files Supplemental Charge Filed with the EEOC

On or about June 29, 2009, Ms. Goodwine filed a supplemental charge of discrimination with the EEOC, alleging a pattern and practice of discriminatory and retaliatory conduct at DoITT (Compl. ¶ 177). The supplemental charge was corrected on or about September 3, 2009. Subsequent to filing the EEOC charge, DoITT's predominately Caucasian male senior management continued to condone and foster a racist, sexist, discriminatory and hostile work environment, and continued to retaliate against Ms. Goodwine. Despite her qualifications, she continued to be denied appointments and promotions on account of her sex and race and in retaliation for her EEO and EEOC complaints, including, but not limited to, positions on ECTP, such as the Director of Administration position in or about August 2009 (Compl. ¶¶ 170, 171). Upon information and belief, the Caucasian employee selected for the Director of Administration position had no greater qualifications or experience than Ms. Goodwine (Compl. ¶ 171).

After filing the charge of discrimination and retaliation with the EEOC, Ms. Goodwine also was denied resources and information necessary to adequately perform her duties, received offensive and patronizing emails from senior employees, was ostracized and excluded from senior level meetings, and was the subject of an investigation conducted by another City agency, the Department of Investigation ("DOI") (Compl. ¶ 178). When she voiced her concerns about the hostility and disparaging treatment to Defendant Cosgrave, he responded in a demeaning and patronizing manner, and in a meeting in or about August 2009, he publicly criticized and humiliated her in the presence of her colleagues, telling her that she was "driving [him] crazy"

with her complaints, which she and others in attendance, understood to be regarding her complaints of discrimination and retaliation (Compl. ¶ 180).[1]

### 2010—Denial of Promotional Opportunities After Filing Supplemental EEOC Charge

Defendant Carole Post was appointed Commissioner of DoITT in early 2010. (Compl. ¶ 182). Upon information and belief, DoITT Commissioners collectively created over seventy (70) higher level positions at managerial and above titles and hired fewer than five (5) African-American employees for these positions (Compl. ¶ 168). Upon Defendant Post's appointment, Ms. Goodwine applied for and was interviewed for the Commissioner's Chief of Staff position. Ms. Goodwine was qualified for the position because her duties in CTO were almost identical to the posted position (Compl. ¶¶ 183, 184).

During the interview for the Chief of Staff position, Defendant Post asked Ms. Goodwine, "Why she should hire someone who has made less than favorable statements about the agency?" Ms. Goodwine understood Defendant Post's comment to refer to Ms. Goodwine's complaints about discrimination and retaliation. (Compl. ¶ 186)

On or about August 2, 2010, Ms. Goodwine again supplemented her EEOC charge to include Post's comment referring to her EEO and EEOC complaints, during her interview. (Compl. ¶ 187). A few months after she supplemented her EEOC charge with additional instances of discrimination throughout the agency, Ms. Goodwine learned that she was not hired for the Chief of Staff position (Compl. ¶ 188). Upon information and belief, Ms. Goodwine had more experience than the selected non-African-American candidate (Compl. ¶ 185).

---

[1] It should be noted that the DOI is one of oldest law enforcement agencies in the country and its purpose is to combat corruption in NYC public institutions.

Not too long after she was denied the Chief of Staff position, Mr. Lebow informed Ms. Goodwine that Defendant Post planned to disband the CTO group under a reorganization (Compl. ¶ 189). As such, Ms. Goodwine applied for numerous other positions, in or about 2010, at DoITT including, but not limited to, a position as a Director of Finance and Administration in NYC-TV, ECTP Assistant Commissioner, ECTP Senior Director of Program Management, Chief of Staff, and Executive Director of Citywide Contracts. Ms. Goodwine was not hired for any of the positions, including the ECTP Senior Director of Program Management, for which she was not even interviewed, despite the fact that the position was substantially similar to the position Ms. Goodwine held in ECTP (Compl. ¶¶ 190, 191). Instead, a Caucasian female was hired for the position in or about March 2010, contrary to DoITT's formal policy of considering its own employees for opportunities for promotion and the informal practice of interviewing all internal candidates with the requisite qualifications (Compl. ¶ 192). Ms. Goodwine was equally or more qualified than the Caucasian selected for the ECTP position (Compl. ¶ 193).

Subsequent to Ms. Goodwine's August 2010 supplemental EEOC Charge, Ms. Goodwine was discriminatorily and retaliatorily denied every promotional opportunity she sought, at times not even being interviewed for many positions for which she was qualified including, but not limited to, the position of Senior Director Project Portfolio Management, HHS-Comment Director of Administration, ECTP Operations Manager, IT Vendor Management Lead, and Assistant Commissioner for the Project Management, many of these positions went to individuals with no greater qualifications or experience than Ms. Goodwine, including several Caucasian males (Compl. ¶ 195).

### 2010—Plaintiff Takes Leave Under the Family Medical Leave Act

In or about March 2010, Ms. Goodwine applied for and was granted Family Medical

Leave Act ("FMLA") leave for cancer treatment (Compl. ¶ 197).  Ms. Goodwine remained on

medical leave for approximately fourteen (14) to fifteen (15) months; in the process, she utilized

"dedicated leave" that was donated to her from friends that were employed at various City

agencies.  Ms. Goodwine used the dedicated leave after she exhausted all of her accrued sick and

vacation leave balances (Compl. ¶ 198). DoITT's Human Resources Department informed Ms.

Goodwine that her dedicated sick leave had been exhausted and that she was to report to work on

or about July 15, 2011 (Compl. ¶ 199). On or about July 7, 2011 she received a phone call from

DoITT's Payroll Director, informing her that she could not return to work until August 2011

because DoITT needed time to review her resume to see where she would "fit in" (Compl. ¶

200). Ms. Goodwine protested and had her union intervene and was allowed to return on July, 18

2011.  In this instance, DoITT forced Ms. Goodwine to use medical leave and lose compensation

(Compl. ¶¶ 202–204)   In comparison, Caucasian employees, such as Margaret Budzinski, were

allowed to work from home and draw a full-time salary (Compl. ¶¶ 204–207).

### Assigned to 311 Customer Service Center

When Ms. Goodwine returned from leave, she was demoted and assigned to the 311

Customer Service Center ("311") (Compl. ¶ 203). Upon information and belief, there were other

positions and projects to which Ms. Goodwine could have been assigned upon her return that

would have been commensurate with the duties and responsibilities she was accustomed to

performing and appropriate for someone with her credentials and background (Compl. ¶ 207).

Upon information and belief, Ms. Goodwine, could have been asked to work on projects she had

previously worked on while with the CTO, such as "Notify NYC" and/or "NYC Big Apps,"

projects (Compl. ¶ 208). Ms. Goodwine could have been selected for the Assistant

Commissioner of Vendor Management position (Compl. ¶ 209). The position with 311 was a

significant demotion for Ms. Goodwine—stripped of her managerial role, had no subordinates working for her and her primary job responsibility was "taking pictures of clogged toilets, paint chipping off walls and other service related issues and opening service tickets to General Services" (Compl. ¶¶ 211–213). Due to the demeaning nature of the job, Ms. Goodwine's colleagues began referring to her as the "shit girl" (Compl. ¶ 214). The demotion was profound and humiliating to Ms. Goodwine who went from managing multi-million-dollar city-wide technology contracts, to creating service orders for clogged toilets.

Following her return from leave, Ms. Goodwine was told by Robert Whalen, DoITT's Director of General Services, who was close to Defendants Grippo and Bergmann, that she wasn't "anything" and that she better "watch [her]self," and "that he is not the only one that will come after [Ms. Goodwine]" (Compl. ¶ 215).  Subsequent to Mr. Whalen's threat after her return from leave and demotion, Ms. Goodwine was subjected to workplace intimidation by another employee, who upon information and belief, reported to and was acting at the behest of Whalen (Compl. ¶¶ 217–219). Specifically, this employee screamed, menaced and waved his arms in a threatening manner, coming to within inches of Ms. Goodwine's face, while preventing Ms. Goodwine from leaving a conference room, attempted to hit Ms. Goodwine with a chair as she was leaving at the end of the work day, and threatened to "slap a bitch" while staring at her (Compl. ¶¶ 219, 220). Despite reporting the intimidation and gender-based harassment to DoITT senior management, labor relations, general counsel office among other senior level employees including Mr. Whalen's immediate supervisor, nothing meaningful was done to address the retaliation, intimidation and hostility directed at Ms. Goodwine.  Rather, astoundingly, the intimidating employee received a raise (Compl. ¶¶ 218–223). On or about May 2012, Ms. Goodwine filed a third supplemental charge with the EEOC, concerning the 311 demotion and

the ongoing discrimination, retaliation, intimidation and hostility she continued to experience at

DoITT (Compl. ¶¶ 224, 225). After experiencing months of harassment and threats that went

unaddressed by management, in or about February 2014, Ms. Goodwine left DoITT on disability

retirement (Compl. ¶¶ 14).

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of plaintiff's claim for

relief, and in considering the legal sufficiency, a court must accept as true all well-pleaded facts

in the complaint and draw all reasonable inferences in plaintiff's favor. *See Krasner v. HSH*

*Nordbank AG*, 680 F. Supp. 2d 502, 511 (S.D.N.Y. 2010). In an employment discrimination

case, the "ordinary rules for assessing the sufficiency of a complaint" under Federal Rule of Civil

Procedure 8(a)'s notice pleading standard apply. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506,

511 (2002). The Second Circuit has recently reconciled the Supreme Court's decisions in

*Swierkiewicz, Twombly,* and *Iqbal,* to hold that to survive a motion to dismiss a plaintiff in an

employment discrimination matter is not required to plead facts *establishing* a prima facie

case. *Littlejohn v. City of New York*, 795 F.3d 297, 306–11 (2d Cir. 2015). Rather, a plaintiff

satisfies the notice pleading standard of "plausibility" under the Supreme Court's decision in

*Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009), simply by alleging "plausible support for a minimal

inference of discriminatory motivation," and "need not give plausible support to the ultimate

question of whether the adverse employment action was attributable to discrimination."

*Littlejohn*, 795 F.3d at 311. The plaintiff's burden at this stage is "very lenient, even *de*

*minimis.*" *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir. 2003).

## ARGUMENT

I.     **ALL OF MS. GOODWINE'S CLAIMS, AS PLED, ARE TIMELY**

### a.  Ms. Goodwine's Pay Discrimination Claims Under Title VII, Section 1983, NYSHRL and NYCHRL Constitute A Continuing Violation And Thus Appropriately Date Back To April 2006

Pursuant to the Ledbetter Fair Pay Act (the "Ledbetter Act"), 42 U.S.C. § 2000e–5(e), a plaintiff may avail herself of the accrual provisions by pleading a claim for pay compensation as a result of membership in a protected class. (See *Davis v. Bombardier Transp. Holdings,* 794 F.3d 266, 270 [2d Cir. 2015] in which the Second Circuit Court of Appeals affirmed the district court's determination that the plaintiff would not avail herself of accrual provisions of the Ledbetter Act because she failed to establish that her reduction in pay claim was tied to a timely filed protected class claim under Title VII.)

Further, the accrual provisions under the Ledbetter Act equally apply to section 1983, NYSHRL and NYCHRL claims. *See Husser v. N.Y.C. Dep't of Educ.*, No. 12-CV-6095 MKB JO, 2015 WL 5774741, at *7 (E.D.N.Y. Sept. 30, 2015) (holding that the Ledbetter Act applies to both the NYSHRL and NYCHRL); *see also Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1026 (7th Cir. 2011) (holding "that there is no principled reason for applying the paycheck accrual theory [established in the Ledbetter Act] to claims arising under Title VII but not to those arising under § 1983).

As set forth below, Ms. Goodwine has sufficiently alleged pay discrimination beginning upon her hiring in April 2006 and continuously resetting with each paycheck Ms. Goodwine received until she retired in February 2014.  The Amended Complaint alleges that because of her race and gender Ms. Goodwine was paid less than white males. To support her claim, the Amended Complaint details the amount of pay disparity and identifies numerous white male comparators. *See* Amended Compl.  ¶¶ 48, 51, 52, 84, 85, 119, 120, 121, 123, 124, 134, 169, 196, 229(b).

**b. Ms. Goodwine's NYSHRL And NYCHRL Claims Were Tolled During The Pendency Of Her EEOC Complaint And Thus Date Back To July 2006.**

Ms. Goodwine's discrimination, retaliation and hostile work environment claims under the NYSHRL and NYCHRL are actionable. Claims brought under the NYSHRL and NYCHRL are subject to a three-year (3-year) statute of limitations, which is tolled for the period between the filing of an EEOC charge and the issuance by the to-sue letter from that agency. *See E.E.O.C. v. Bloomberg L.P.,* 967 F. Supp. 2d 816, 831 (S.D.N.Y.2013); N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8–502(d); *see also Esposito v. Deutsche Bank AG*, No. 07 CIV. 6722(RJS), 2008 WL 5233590, at *5 (S.D.N.Y. Dec. 16, 2008) (collecting cases and noting that "[a]lthough the Second Circuit has yet to definitively opine on the issue of whether the filing of a charge with the EEOC serves to automatically toll the statute of limitations on claims asserted that the three-year statute of limitations applicable to claims under NYSHRL and NYCHRL … [are] tolled during the period in which a complaint is filed . . . with the EEOC." (citations omitted).

As in the *Esposito* case, in which the EEOC had held on to the charge more than five years, the EEOC held on to Ms. Goodwine's charge for about five and one-half years (5 years, 8 months and 21 days to be precise) during which her claims were tolled. Ms. Goodwine commenced employment in April 2006 and filed her external charge with the EEOC approximately three (3) years later, in April 2009. She received her EEOC charge on January 19, 2015 and then filed her federal complaint within 90 days, as required, on April 14, 2015 (on the 85th day after receiving the EEOC right to sue).[2] While the Amended Complaint does not

---

[2] The Notice of Right to Sue issue by the EEOC to Ms. Goodwine is dated January 16, 2015 and, as such, January 19, 2015 is a proper assumption as to the date Ms. Goodwine received it. *See* Amended Compl. ¶ 6. *See Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996) ("Normally it is assumed that a mailed document is received three days after its mailing.")

provide the exact date when Ms. Goodwine commenced employment in April 2006 or the exact date in April 2009 when she initially filed with the EEOC, we may safely state that her NYSHRL and NYCHRL are viable going back to at least June 2006, at or near the time of Defendant Schachter's hiring at the DoITT. *See* Amended Compl. ¶¶ 5, 6, 7, 60, 167; *see also* Preliminary Statement on pg. 1.

Defendants' reference in their brief to *Castagna v. Luceno*, 744 F.3d, 254 (2d Cir. 2014) to support the proposition that filing of charge of discrimination does not toll the statute of limitations is not applicable to the present case. *Castagna* concerned pendent state intentional tort claims such as assault and battery. Here, unlike the *Castagna* case, we are concerned with pendent discrimination claims and the lower district courts in this circuit continue to follow reasoning in *Boomberg* and *Esposito* regarding the tolling of state and city claims during the pendency of the EEOC investigation (*see Derrick v. DCM Erectors, Inc.,* 2016 U.S. Dist. LEXIS 11930 (S.D.N.Y. 2016).

### c. Ms. Goodwine's Discrimination, Retaliation, and Hostile Work Environment Claims Pursuant to Title VII, Section 1983 and 1981 Claims Are Also Timely

Title VII provides a limitations period of 300 days for a claimant to file an administrative charge with the EEOC. *See* 42 U.S.C. 2000e-5(e) (1).  Assuming that Ms. Goodwine filed her charge with the EEOC on April 29, 2009, her charge would cover discriminatory events that occurred from July 3, 2008.

Ms. Goodwine filed her federal complaint on April 14, 2015. When filing in court, discrimination and retaliation claims brought pursuant to 42 U.S.C. § 1981 have a four-year statute of limitations period, while claims filed under 42 U.S.C. § 1983 maintain a three-year statute of limitations period; under such a rubric, Ms. Goodwine's claims would cover events from April 2011 and April 2012, respectively.  This patchwork of statute of limitations evidently

create time gaps that may be overcome by the court treating gap periods as actionable under the "continuing violation exception" of the statute of limitations or the court may consider such time-gap factors as background to timely allegations of adverse action.

The continuing violation exception applies when the complained of conduct is not a discrete act, but is "repeated conduct" that "occurs over a series of days or perhaps years" as enumerated in *Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 122 (2002). *See Bermudez v. City of New York*, 783 F. Supp. 2d 560, 582 (S.D.N.Y 2011).

The doctrine similarly applies to "any incident of retaliation in furtherance of an ongoing policy ... as to all claims of acts of retaliation under that policy even if they would be untimely standing alone." *Crosland v. City of New York*, 140 F. Supp. 2d 300, 307 (S.D.N.Y. 2001) *aff'd sub nom. Crosland v. Safir*, 54 F. App'x 504 (2d Cir. 2002) (internal citation omitted).

The doctrine has also been used in instances of hostile work environment claims because those claims are different in kind from discrete acts—by their very nature, hostile work environment claims involve repeated conduct. The unlawful employment practice therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75–76 (2d Cir. 2010) (internal citation omitted). Accordingly, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* "Therefore for hostile work environment claims, so long as one act is within the limitations period, all of the acts can be relied on to show a hostile work

environment." *Shomo v. City of New York*, 579 F.3d 176, 181 (2d. Cir. 2009); *see also Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004).

It is important to note that even if the court determines that certain discrete incidents are time-barred and therefore cannot provide an independent basis for liability, they may be utilized as circumstantial evidence of intent. *See Griffin v. N.Y.C. Off-Track Betting Corp.*, No. 98 CIV 5278 RCC, 2002 WL 252758, at *4 (S.D.N.Y. Feb. 20, 2002); *see also Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1096–97 (2d Cir. 1988) (noting that discriminatory intent may be proven through evidence of past conduct or incidents); *Fitzgerald*, 251 F.3d at 365 ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period."); *see also Govia*, 140 F. Supp. 2d at 325 (dismissing certain claims as time-barred but allowing plaintiff to seek discovery regarding those incidents as bearing on the issue of discriminatory intent); *Mareno v. Madison Square Garden, L.P.*, No. 98 Civ. 2719, 2000 WL 1401156, at *2 (S.D.N.Y. Sept. 26, 2000) (noting that "prior behavior, even if outside the limitations period, may be considered in evaluating a decision maker's intent at the time of the complained-of conduct").

In *Hagan v. City of New York*, No. 13 Civ. 1108, 2014 WL 4058067, (S.D.N.Y. Aug. 15, 2015), a case dealing with some of the same actors in this case, wherein the defendants made the same argument in so far as it was argued that the plaintiff could not rely upon discriminatory and retaliatory acts that occurred 300 days before she had filed her EEOC charge. The court reasoned that whether or not the alleged discriminatory and retaliatory acts are actionable under a continuing violation theory exception, the plaintiff had made timely allegations of an adverse employment action—her employment termination—and, therefore, the court could consider the

other allegations as background evidence to determine whether the adverse action was the result of a discriminatory motive. *Id* at footnote 10.

## II.     MS. GOODWINE STATES A CLAIM OF ACTION FOR RETALIATION

"To state a claim in violation of retaliation in violation of Title VII, a plaintiff must plead facts that would tend to show that: (1) she participated in a protected activity; (2) that the defendants knew of the protected activity; (3) an adverse action; and (4) there existed a causal connection between the protected activity and the adverse action." *Littlejohn v. City of New York,* 795 F.3d 297, 317 (2d Cir. 2015).[3]  At this stage, a plaintiff need only plead facts that plausibly lend support to an inference of retaliation. *Id.* at 317. Proof of the causation element "can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000).

Ms. Goodwine undeniably engaged in protected activity, as she lodged multiple complaints of discrimination with supervisors, internally with DoITT's EEO Office, and externally with the EEOC. *See* Amended Compl. ¶¶ 72, 87, 92, 93, 101, 116, 132, 146, 155, 158, 162, 164, 167, 177, 181, 187, 224; *see also Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2d Cir.

---

[3] The Complaint contains multiple levels of different statutory claims of retaliation. Courts apply the same standard used in Title VII cases in analyzing NYSHRL, NYCHRL, §§ 1981 and 1983 retaliation claims. *See Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 592 (S.D.N.Y. 2012) *aff'd,* 526 F. App'x 124 (2d Cir. 2013) (holding that NYSHRL and NYCHRL apply the same analysis as Title VII but clarifying that "liability for retaliation under the NYCHRL is broader than under the companion federal and state statutes"); *Mihalik v. Credit Agricole Cheuvreux N. Am. Inc.* 715 F.3d 102, 109 (2d Cir., 2013) NYCHRL requires an independent analysis); *Acosta v. City of New York,* 2012 WL 1506954, at *8 (S.D.N.Y. Apr. 26, 2012) ("Claims of retaliation under [Title VII and § 1981] are generally analyzed in the same way, with the same standards of liability."); *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 406 (S.D.N.Y. 2014) ("the standards for evaluating Title VII and § 1983 retaliation claims are identical").

1993) ("Title VII broadly provides that '[i]t shall be [an] unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' 42 U.S.C. Sec. 2000e-3(a). The phrase 'opposed any practice' encompasses an individual's complaints to supervisors regardless of whether she also files an EEOC charge.") (citing *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir. 1992) (marks and quotes in original)).

Defendants were undeniably aware that Ms. Goodwine had engaged in protected activities. Each complaint of discrimination was lodged with either a supervisor (including certain of the individual Defendants), with DoITT's Office of Equal Employment Opportunity, or with the Equal Employment Opportunity Commission. *See* Amended Compl. ¶¶ 72, 87, 92, 93, 101, 116, 132, 146, 155, 158, 162, 164, 167, 177, 181, 187, 224.

Third, Ms. Goodwine certainly suffered an adverse employment action. Notably, the standard for showing an adverse action in the retaliation context is more lenient than it is for a substantive discrimination claim. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 363 (S.D.N.Y. 2006) in which the court held that the "assignment to arduous tasks, even without a change of job title, is one type of adverse action that could deter Title VII protected activity." *Id.* at 363. Simply, Ms. Goodwine must only show that it is "the type of action that would dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 199, 2405, 2420, 165 L. Ed. 2d 345 (2006); *see also Kessler v. Westchester Cty. Dep't of Soc. Serv.*, 461 F.3d 199, 207 (2d

Cir. 2006) (internal quotation marks omitted)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F. 3d 72 (2d. Cir. 2015).

Similarly, in *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002) (Scheindlin, D.J.) (internal citations omitted), the Court found that adverse employment actions may include, among other things, discharge or demotion; denial of provisional or permanent promotions and or positions; involuntary transfers that entail objectively inferior working condition, denial of benefits, denial of a requested employment accommodation, and denial of training.

Here, following her initial complaints of discrimination, Ms. Goodwine encountered the whiplash of retaliation, which continued and followed her throughout her employment, despite continuous complaints. Specifically, following her initial complaint of discrimination based on her race and gender, Ms. Goodwine was excluded from critical program meetings and regular team meetings, ostracized by the team, completely shut out of communications, and humiliated in front of her peers. *See* Amended Compl. ¶ 95. Additionally, Ms. Goodwine was assigned administrative tasks not in her original job description such as keeping track of time sheets, invoicing, scheduling and monitoring appointments. *Id.* ¶ 98. Ms. Goodwine was also forbidden from performing audits on the ECTP, which was one of her most important responsibilities. *Id.* ¶ 99. Ms. Goodwine was ultimately transferred from the ECTP, just two weeks after DoITT's internal EEO determination that Defendant Schachter had retaliated against her, to an undesirable, unposted, undefined position in the Chief Technology Office—a functional demotion. *Id.* ¶¶ 111–115. This new position lacked the outward external focus and prestige of her position on the ECTP, which had allowed her to demonstrate her skill set to many individuals at higher levels of City government. *See* Amended Compl. ¶¶ 106; *see also Ghaly v. U.S. Dep't*

*of Agric.*, 739 F. Supp. 2d 185, 199 (E.D.N.Y. 2010) (employer's decision to transfer plaintiff to an undesirable shift constituted an adverse employment action as his is job duties were thereby drastically reduced).

Unfortunately, the retaliation did not end there for Ms. Goodwine. Rather, Ms. Goodwine had a permanent target on her back for the rest of her career, which only became more prominent as Ms. Goodwine continued to stand up for herself—ultimately filing an EEOC complaint. *Id.* ¶¶ 167–227. Ms. Goodwine was denied multiple promotions at DoITT including, but not limited to, the following: in 2007, she applied for a Director of Cost Recovery with the Associate Commissioner of Financial Services (*id.* ¶ 109), in 2008 she applied for the ECTP Contract and Budget Administrator her former role (*id.* ¶ 134, 135), in 2009 she applied for the ECTP Director of Administration (*id.* ¶ 172), in 2010, she applied for the position Commissioner's Chief of Staff (*id.* ¶¶ 183, 184), she also applied for a position as a Director of Finance and Administration in NYC-TV, ECTP Assistant Commissioner, ECTP Senior Director of Program Management, and Executive Director of Citywide Contracts. Ms. Goodwine was not hired for any of the positions she applied for, including the ECTP Senior Director of Program Management, for which she was not interviewed despite the fact that the position was substantially similar to the position Ms. Goodwine held in ECTP (Compl. ¶¶ 170–171).

In a culminating act of retaliation, after Ms. Goodwine returned from extended FMLA leave while she underwent cancer treatment, she was placed in the 311 Customer Service Center a significant demotion from what was already a functional demotion to the CTO. *Id.* ¶ 211. Prior to FMLA leave, Ms. Goodwine had six subordinates; however, upon her return she was stripped of her managerial role and no longer had any subordinates. *Id.* ¶ 212. Even more humiliating,

Ms. Goodwine began being called the "shit girl" because her job was taking pictures of clogged toilets and issuing service tickets to general services. *Id.* ¶ 213.

Finally, Ms. Goodwine can certainly establish the final element of her retaliation claim— a causal connection between her protected activity and the adverse employment actions through both direct and indirect evidence. Most directly, during the internal EEO complaint filed by Ms. Goodwine it was determined that she had been retaliated against for her protected complaints of discrimination. *Id.* ¶ 102. The EEO determination went so far as to note that Schachter "often flagrantly indicated an unwillingness to comply" with workplace policies. *Id.* ¶ 103. Also, in the multitude of jobs for which Ms. Goodwine applied but was denied, as discussed above, Ms. Goodwine was told outright that she did not get the job because while she could do the job, "the team does not feel you will fit in." *Id.* ¶¶ 141–143; 186 (she was directly asked by Commissioner Post, "why would I hire someone who has made less than favorable statements about the Agency?"—referring to Ms. Goodwine's allegations of discrimination and retaliation). Further, in late 2008, Ms. Goodwine was denied appointments to vacant more senior positions in the CTO, for which she was uniquely qualified, because Defendant Grippo deliberately eliminated the position within the CTO and reassigned the duties and budget of the position to his staff. *Id.* ¶¶ 150–154. Subsequently, Ms. Goodwine learned that Grippo had told others that Ms. Goodwine "should be careful," that she was a "troublemaker" and that she would "pay"— which were direct threats of retaliation. *Id.* ¶ 157.

In addition, Ms. Goodwine may also establish a causal connection indirectly by showing the protected activity followed closely in time by adverse employment action. *See Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely

followed in time by the adverse action." (internal quotation marks omitted)).  The allegations in the Amended Complaint plainly detail that shortly after Ms. Goodwine's complaints of discrimination, she suffered retaliation.  *See* Amended Compl. ¶ 111 (Ms. Goodwine's functional demotion to the CTO occurred only two weeks after DoITT's internal EEO determination that Schachter had retaliated against her); *see also id.* ¶ 17.  Subsequently, she was also denied appointment to the Director of Administration for the ECTP, a position she was extremely qualified for, only four months after filing her EEOC charge; *id.* ¶ 182 (denied a position for the Commissioner's Chief of Staff approximately four months after Ms. Goodwine amended her EEOC complaint to allege a pattern and practice of discriminatory and retaliatory conduct at DoITT).

In the present case, these periods are sufficiently short to permit a finding of temporal proximity and thus a causal connection.  *See Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.)

It should also be noted that Plaintiff has also filed with this opposition brief a Motion to File a Second Amended Complaint with the Court. The proposed Second Amended Complaint seeks to add additional protected activity to an already voluminous demonstration of protected activity for purposes of the various retaliation claims described in the First Amended Complaint—all of which contributed separately and in the aggregate to Ms. Goodwine's retaliatory treatment at the DoITT. The proposed Second Amended Complaint also includes a First Amendment retaliation claim under Section 1983 for Ms. Goodwine's communication with the New York City Council during which she sought redress for what she perceived to be a

pattern and practice of cronyism, discrimination and retaliation at the DoITT (*see* Proposed

Second Amended Compl. ¶¶ 226–231).

### III.   GOODWINE STATES CLAIMS FOR PROMOTIONAL DISCRIMINATION, COMPENSATION, BASED ON HER RACE AND/OR GENDER AND/OR SEX IN UNDER TITLE VII TO SECTION 1983, SECTION 1981 AND NYSHRL

For purposes of a 12(b)(6) motion, a plaintiff alleging racial and/or gender discrimination

need only plead facts that plausibly lend support to an inference of discrimination. The legal

standard in summary judgment motions are used as a guide: "(1) that she belonged to a protected

class, (2) that she was qualified for the position she held, (3) that she suffered an adverse

employment action, and (4) that the adverse employment action occurred under circumstances

giving rise to an inference of discrimination. *Stewart v. City of New York*, No. 11 Civ. 6935,

2012 WL 2849779, at *5 (S.D.N.Y. July 10, 2012) citing *Feingold v. New York,* 366 F.3d 138,

152 (2d Cir. 2004).[4]  In disparate treatment claims, with respect to the fourth element, a plaintiff

is required to set forth plausible allegations supporting a discriminatory motive by the decision

maker. *See Hagan v. City of New York*, No. 13 Civ. 1108, 2014 WL 4058067, at *8 (S.D.N.Y.

Aug. 15, 2014) ("Disparate treatment requires proof that the defendant acted with a

discriminatory intent or motive.").

Here, there is no doubt that Ms. Goodwine satisfies the first two elements.  Ms.

Goodwine is an African-American female. *See* Amended Compl. ¶ 12.  And, Defendants do not,

nor could they, contest that Ms. Goodwine was qualified for the positions she held.  *See*

---

[4] The Court applies the same legal standard for discrimination claims under Title VII to § 1983, § 1981 and NYSHRL claims. *See Allen v. City of Yonkers,* 803 F. Supp. 679, 701 (S.D.N.Y.1992) ("Title VII and § 1983 claims involve the same factual allegations and must be evaluated under the same legal standard."); *Choudhury v. Polytechnic Inst. of N.Y.,* 735 F.2d 38, 44 (2d Cir.1984) ("same elements constitute a claim for employment discrimination under § 1981 as under Title VII"; however, "unlike a Title VII claim, a § 1981 claim may be brought against individual defendants."); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 257 (E.D.N.Y. 2012) *aff'd,* 713 F.3d 163 (2d Cir. 2013) ("[c]laims under the NYSHRL are analyzed under the same standards as federal discrimination claims").

*generally* Amended Compl.; and Defendants' Memo of Law.  Moreover, Defendants do not

contest that Ms. Goodwine has suffered numerous adverse employment actions including, but

not limited to, denials of compensation, functional demotions and failure to promote comparable

to similar situated Caucasian and or male employees.  *See, e.g., Treglia v. Town of Manlius*, 313

F.3d. 713, 720 (2d Cir. 2002) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (the

more obvious forms of adverse employment action include discharge, refusal to hire, refusal to

promote, demotion, reduction in pay and reprimand).

Finally, Ms. Goodwine can establish that the adverse employment actions were suffered

under circumstances that give rise to an inference of discrimination. There are many ways

through which a plaintiff can show an inference of discriminatory intent.  Illustrative examples

have included: "criticizing plaintiff's performance in ethnically degrading terms, invidious

comments about others in plaintiff's protected group, the more favorable treatment of employees

not in the protected group, and the sequences of events leading to the negative employment

action." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir. 2001) (quoting

*Chambers v. TRM Copy Ctr. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

Here, Ms. Goodwine's allegations establish the inference of discriminatory intent in

several ways.  First, the Amended Complaint provides numerous examples of similarly situated

Caucasian and male individuals who were treated more favorably than Ms. Goodwine.  An

inference of discrimination may be drawn from the mere fact that a similarly situated person who

is not in Ms. Goodwine's protected class was treated more favorably than Ms. Goodwine. *See*

*Risco v. McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012) (citing *Mandell v. County of Suffolk,*

316 F.3d 368, 379 (2d Cir. 2003). Further, whether two employees are sufficiently similarly

situated to allow for comparison presents a question of fact rather than a legal question to be resolved on a motion to dismiss.

Moreover, discrimination can also be inferred from prior occasions when plaintiff was denied promotions and salary raises in favor of individuals outside her protected class with equal or less experience, even if such instances are time-barred and therefore cannot provide an independent basis for liability. *Griffin v. N.Y.C. Off-Track Betting Corp.*, No. 98 CIV 5278 RCC, 2002 WL 252758, at *4 (S.D.N.Y. Feb. 20, 2002); *see also Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1096–97 (2d Cir.1988) (noting that discriminatory intent may be proven through evidence of past conduct or incidents); *Fitzgerald v. Henderson,* 251 F.3d 345, 365 (2d Cir. 2001) ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period."); *Govia v. Century 21, Inc.,* 140 F. Supp. 2d 323, 325 (S.D.N.Y. 2001) (dismissing certain claims as time-barred but allowing plaintiff to seek discovery regarding those incidents as bearing on the issue of discriminatory intent); *Mareno v. Madison Square Garden, L.P.,* No. 98 Civ. 2719, 2000 WL 1401156, at *2 (S.D.N.Y. Sept. 26, 2000) (noting that prior behavior, even if outside the limitations period, may be considered in evaluating intent at the time of the complained-of conduct).

Here, Ms. Goodwine was treated differently than her white male counterparts.  Defendant Schachter assigned her tasks such as getting coffee, scheduling, chauffeuring him around the city, placing his lunch orders, and other menial tasks well below her pay grade—none of which he assigned to her Caucasian male peers nor to non-African-American women in lower pay grades. *See* Amended Compl. ¶¶ 70, 71.

Moreover, on multiple occasions denied promotions that were given to individuals outside her protected class. *Id.* ¶¶ 109, 138, 139, 185, 192. Moreover, Ms. Goodwine has identified multiple examples of similarly situated DoITT employees, outside of her protected classes, who were unlawfully paid more than she was. *See* Amend. Compl. ¶¶ 50, 51, 82, 84, 123, 124.

Second, Ms. Goodwine plainly alleges that she was called a "cunt" in the workplace, and asked if she had "smoked crack." Thus, Defendants' overt animus clearly satisfies the fourth prong. *Id.* ¶¶ 161–163

Without having filed an answer to the Complaint, Defendants' attempts to discredit Ms. Goodwine's comparator evidence by offering evidence that Michelle Agard, an African-American female, was hired for a position Ms. Goodwine applied for is a poorly disguised attempt to distract from Ms. Goodwine's allegations. As is clear from Ms. Goodwine's Complaint, Ms. Agard was only hired after a white male declined the position and after Ms. Goodwine complained that she was passed over for the position despite being equally or more qualified. Thus, the Agard example more accurately reflects Defendants' thinly veiled attempt to avoid the appearance of impropriety in light of Ms. Goodwine's complaints. Notably, Ms. Agard left the ECTP after only a short time, claiming she "didn't fit in."

Ms. Goodwine's allegations of preferential treatment of similarly situated individuals outside of her protected class and allegations of overt animus reasonably support an inference of discrimination.

## IV.   MS. GOODWINE STATES A CAUSE OF ACTION FOR HOSTILE WORK ENVIRONMENT

To state a claim for a hostile work environment in violation of Title VII, a plaintiff need only plead facts that would tend to show that the complained-of conduct: "(1) is objectively severe or

pervasive (such that) a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected class.]" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (overturning district court's determination that plaintiff's work environment was not objectively hostile) citing *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001) (internal citations and punctuation omitted) (emphasis added).[5]

The assessment of a work environment's objective hostility is based on the "totality of the circumstances" and, in making this assessment, courts typically consider the following factors: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993). As the Second Circuit has articulated, "to avoid dismissal under FRCP 12(b) (6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, and we have repeatedly cautioned against setting the bar too high." *Patane*, 508 F.3d at 113, quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotations and punctuation omitted). *Id.* not exclusive ¶¶ 64-95, 135-136, 157-166,178-181, 200-227).

## V.   THE BROADER AND MORE LENIENT STANDARD OF THE NEW YORK CITY HUMAN RIGHTS LAW

---

[5] The Court applies the same legal standard for hostile work environment claims under Title VII to § 1983, § 1981 and NYSHRL claims. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014) (same standard under Title VII, § 1981, and the NYSHRL); *Cortes v. City of New York*, 700 F. Supp. 2d 474, 487 (S.D.N.Y. 2010) (same standard under 1983). The standard for maintaining a hostile work environment claim is lower under the NYCHRL, as a plaintiff need only plead "the existence of unwanted [race]-based conduct" because liability under NYCHRL is "determined by the existence of unequal treatment." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38 (2009)).

The Second Circuit has recently clarified that "claims under the NYCHRL are to be evaluated separately from federal and state law claims and given liberal, independent construction." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F. 3d 102, 109 (2d Cir. 2013). The 2005 amendment to the NYCHRL required that its provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil human rights laws, including those law with provisions comparably-worded to provisions of this title have been so construed." *Id.*

To state a claim under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive and "does not require either materially adverse employment actions or severe and pervasive conduct." *Id.* at 114. Essentially "the plaintiff need only show differential treatment – that she is treated "less well" – because of a discriminatory intent." *Id.*

Unlike the federal law, which requires that for retaliation "adverse actions" must be "material," the NYCHRL prohibits retaliation "in any manner," provided that the retaliatory act or acts are reasonably likely to deter a person from engaging in protected activity. Admin. Code § 8-107(7); *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 71 (1st Dep't 2009).

In light of the foregoing, Ms. Goodwine has sufficiently pleaded her claims for discrimination and retaliation under the NYCHRL.

## VI.    MS. GOODWINE CAN ESTABLISH HER *MONELL* CLAIMS

Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing to properly investigate and address allegations of discrimination and retaliation, when through this failure, the conduct becomes an accepted custom or practice of the employer. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). The liability may also be

premised upon an officially promulgated policy; a single decision by an official with final decision-making authority; a custom or persistent practice; or deliberately indifferent training or supervision. *Id.*; *Webster v. Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc); *Bennett v. City of Slidell*, 735 F.2d 861 (5th Cir. 1984). Ultimately, there is no way for a court to determine whether a policy is in place until the plaintiff is permitted to take discovery. *Gordon v. City of New York*, No. 14-CV-6115(JPO), 2015 WL 3473500, at *15 (S.D.N.Y. June 2, 2015) citing *Cantey v. City of New York*, No. 10 Civ. 4043 (JPO), 2012 WL 6771342, at * 5 (S.D.N.Y. Dec. 11, 2012)

For section 1983 purposes, actions taken by persons whose activities represent official policy may constitute a custom or policy. *Jackson v. Roslyn Bd. of Educ.*, 438 F. Supp. 49, 54 (E.D.N.Y. 2006) (citations omitted). As such, a single adverse action is sufficient to support a claim of municipal liability at this stage, when the unlawful action is taken by an official with final policy-making authority. *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).

To properly plead individual capacity in a section 1983 claim, a plaintiff must allege the personal involvement of the defendant in the alleged constitutional deprivations section 1983. *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (citations omitted). Personal involvement of a supervisory or high official may be established by showing: (1) he failed to remedy the wrong after learning of the violation through a report or appeal; (2) created or continued a custom or policy under which unconstitutional practices occurred; or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Tekula v. Bayport-Blue Point Sch. Dist.*, 295 F. Supp. 2d 224, 233 (E.D.N.Y. 2003) citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *see also Littlejohn*, 795 F.3d 315 (2d. Cir. 2015).

Here, Ms. Goodwine's allegations constitute repetitive, continuous and systematic discrimination and retaliation. Perhaps begun by an individual Associate Commissioner, the conduct spread like a virus—with many DoITT employees, Associate Commissioners and Commissioners taking part.  In addition to the discriminatory acts, Ms. Goodwine was repeatedly crucified for having lodged complaints. Ms. Goodwine's allegations extended beyond simple discrimination and retaliation; rather, they extend up the chain of command to the Commissioner level. In addition, Ms. Goodwine as outlined a pattern and practice of discriminatory conduct with regards to other African-Americans at the DoITT. *Id.* ¶¶ 118-123, 168-169,170, 178, 230 233; Proposed Second Amended Compl. ¶ 227 228, 229, 283; *see also*, *Cornwell v. Robinson,* 23 F3d, 694 (2nd Circuit, 1994) wherein the facts were not dissimilar to the present case prompting the court to find the case properly proceeded under a continuing violation theory.

As such, the City may be held liable for said conduct under *Monell*.

## CONCLUSION

Based on the foregoing, Ms. Goodwine respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.

Dated: February 18, 2016

Respectfully submitted,

_____
J. Patrick Delince
DELINCE LAW PLLC
*Attorneys for Plaintiff*
299 Broadway, Suite 1310
New York, New York 10007
212-382-3544
jpd@delincelaw.com

40