UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                                   :
ADELLE GOODWINE,                                                   :
                                                                   :
                                    Plaintiff,                     :
                       -v-                                         :
                                                                   :
CITY OF NEW YORK, et al.,                                          :
                                                                   :
                                    Defendants.                    :
                                                                   :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  05/23/2016

15-CV-2868 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

        Plaintiff Adelle Goodwine, an African-American woman, brings discrimination and

retaliation claims against the City of New York (the "City"), the New York City Department of

Information & Telecommunicaitons ("DoITT" or the "Agency"), and various former employees

of DoITT: former DoITT Commissioner Paul Cosgrave, former First Deputy Commissioner

Ronald Bergman, former Assistant Commissioner Cordell Schachter, former Chief of Staff

Vincent Grippo, and former Commissioner Carole Post (collectively, the "Individual

Defendants" and, together with the City and the Agency, "Defendants").  In her First Amended

Complaint ("FAC" or "Complaint"), Plaintiff alleges that, throughout her tenure at DoITT from

2006 to 2014, Defendants discriminated against her based on her race and gender, and retaliated

against her for complaining about such discrimination, in violation of 42 U.S.C. § 1981 ("Section

1981"); 42 U.S.C. § 1983 ("Section 1983"); Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Executive Law §

290 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, Administrative Code

§ 8-107 *et seq.* (the "NYCHRL").  Defendants now move, pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, to dismiss the Complaint.  In addition to opposing that motion,

Plaintiff, aided by new counsel, moves to amend her Complaint.  For the reasons stated below, both motions are GRANTED in part and DENIED in part.

## BACKGROUND

The following facts — which are taken from the Complaint, documents it incorporates, and matters of which the Court may take judicial notice — are construed in the light most favorable to Plaintiff.  *See, e.g.*, *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).  Where the FAC lacks specific facts or dates of relevance that are provided in Plaintiff's Proposed Second Amended Complaint, the Court draws from the latter.

On or about April 3, 2006, Plaintiff began working at DoITT as a Contracts/Budget Administrative Manager focused on the Emergency Communications Transformation Program ("ECTP") — a program to improve the City's 9-1-1 system.  (FAC (Docket No. 17) ¶ 44; Decl. J. Patrick Delince Supp. Pl.'s Mot. Leave File Sec. Am. Compl. (Docket No. 88), Ex. A ("Proposed SAC") ¶ 44).  At the time of her hiring, Goodwine had twelve years of experience in public sector procurement, and her starting annual salary was $80,000.  (FAC ¶¶ 47-48).  Among her peers were two Caucasian males who "functioned in the same capacity as" Plaintiff but, according to the Complaint, were paid roughly $20,000 more and held higher "provisional civil service title[s]" than she.  (*Id.* ¶¶ 51-55).  When Goodwine excelled at her job, her supervisor at ETCP put in a request to upgrade her title.  (*Id.* ¶¶ 56, 58-59).  While that request was being processed, however, a new manager, Cordell Schachter, was given authority over ETCP (and with it, Plaintiff and her supervisor).  (*Id.* ¶ 60).

When Schachter arrived in October 2006, things began to go south for Goodwine. (*Id.* ¶ 64). He halted the processing of her change in title. (*See id.* ¶¶ 65-69). He also required Goodwine to "manage his personal schedule, drive him around to various city locations, place his lunch order, fetch him coffee, and other menial tasks." (*Id.* ¶ 70). When she objected that these tasks were below her level of responsibility, Schachter responded: "I am the one that is going to be giving you money. I am the one that is going to approve your pay raises." (*Id.* ¶ 72). When Goodwine, in turn, objected that she did not report directly to him, Schachter raised the issue with Commissioner Cosgrave, who then told Plaintiff that going forward she was to report directly to Schachter on all matters. (*Id.* ¶¶ 73, 75-76). In addition, Schachter sought to determine whether Goodwine's civil service status prevented her termination, but he did not make the same inquiry with respect to her two white male counterparts. (*Id.* ¶¶ 79-80).

Believing she was being treated differently because of her race and gender, Goodwine began discussing the issue with DoITT's Equal Employment Opportunity ("EEO") officer. (*Id.* ¶¶ 81, 92). In November 2006, Goodwine also learned that her salary differed from the salaries of the two white men with higher titles. (*Id.* ¶ 82). Moreover, according to the Complaint, even white men with lesser titles than Goodwine's received a higher salary than she received. (*Id.* ¶¶ 84-85). That same month, Schachter began cancelling regularly scheduled one-on-one meetings with Goodwine. (*Id.* ¶ 86). In December 2006, Goodwine reported to Bergmann, Schachter's supervisor, that she was having "serious issues" with Schachter and that he was treating her differently than the white men on the ECTP team; Bergmann suggested she speak directly to Schachter. (*Id.* ¶¶ 87-89). Around January 2, 2007, Goodwine did so; thereafter, however, Schachter's treatment grew worse. (*Id.* ¶¶ 90-91). A few days later, around January 5, 2007, Goodwine filed a formal internal complaint with DoITT's EEO Office alleging

discriminatory disparate treatment and a hostile work environment, based on a comparison of her treatment to the treatment of her two white male counterparts.  (*Id.* ¶¶ 93-94).

Plaintiff alleges that, in connection with the EEO complaint, Schachter retaliated against her in various ways, including excluding her from meetings and ignoring or shouting at her.  (*Id.* ¶ 95).  Schachter also downgraded the responsibilities included in Plaintiff's formal job description, including removing her responsibility for audits of ECTP, despite her success as an auditor.  (*Id.* ¶¶ 97-99).  As a result, Plaintiff amended her internal EEO complaint to include a claim of retaliation.  (*Id.* ¶ 101).  On or about April 11, 2007, the DoITT EEO Office issued a formal determination substantiating Plaintiff's allegations of retaliation.  (*Id.* ¶¶ 102-103). (Apparently, the EEO Office did not substantiate Plaintiff's allegations of discrimination.  (*See id.* ¶ 107).)  Despite that determination, Schachter remained in charge of ECTP for roughly fourteen more months and was not required to attend EEO training.  (*Id.* ¶ 104).

In May 2007, approximately two weeks after the EEO's determination, Goodwine was transferred to the Chief Technology Office ("CTO").  (*Id.* ¶ 111).  Commissioner Cosgrave had touched on the possibility of that transfer in a prior conversation, but Plaintiff maintains that she never volunteered for the position, which was un-posted, undefined, and, effectively, a demotion. (*Id.* ¶¶ 108-115).  In connection with the transfer, Plaintiff received a salary increase, but it was less than those received by white male comparators; and her salary, despite a merit increase "after a year," was also comparatively less.  (*Id.* ¶¶ 118-125).  Once again, Plaintiff complained to the EEO Office about the circumstances of the transfer.  (*Id.* ¶ 116).

According to the Complaint, Plaintiff's woes continued even after her transfer to CTO. For example, Plaintiff alleges that other employees made disparaging remarks about her value as an employee and excluded her from meetings — prompting additional complaints to the EEO

4

Office.  (*Id.* ¶¶ 129-132).  She also alleges that she was passed over for various job openings.

For example, in June and July of 2008, after Schachter's departure from DoITT, Goodwine

applied and interviewed for a position at ECTP.  (*Id.* ¶¶ 133-135).  Her interview was "overtly

hostile" and, despite her superior qualifications, the position was offered to a white man, who

then declined the post in August 2008.  (*Id.* ¶¶ 133-140).  Goodwine reached out after learning

that the position was still open; in response, the ECTP supervisor stated that while he knew that

she could do the job, she should not reapply because "'the team does not feel you will fit in.'"

(*Id.* ¶ 141).  Plaintiff believes that Bergmann ensured that she did not get the position as

retaliation for her filing a complaint against Schachter, Bergmann's personal friend.  (*Id.* ¶¶ 144-

145).  Ultimately, the position went to an African-American woman, but she later resigned

because, in her words, she did not "'fit in.'"  (*Id.* ¶ 146).  Next, between June and September of

2008, Goodwine was passed over for two vacancies in higher positions at the CTO — one of

which was eliminated and the other of which went to a Caucasian employee.  (*Id.* ¶¶ 151-154).

       The Complaint lists other incidents that Plaintiff believed to be retaliatory.  For example,

Plaintiff alleges that, in or about February 2009, CTO Chief of Staff Grippo told a colleague of

hers that Plaintiff should be "careful," called her a "troublemaker," and indicated she would

"pay."  (*Id.* ¶¶ 157-158).  Plaintiff informed Grippo at that time that she understood his

comments to be a threat of retaliation; she also informed him of the earlier instances of

retaliation (recounted above) and complained that her career was being blocked by

discrimination and retaliation.  In addition, she complained to various colleagues, including

Grippo, about other conduct — for example, that Associate Commissioner Winker had asked her

if she was "smoking crack" (a comment she perceived to be racial) and that senior level

managers (namely, Deputy Commissioner of Operations Mike Bimonte) were referring to her as

a "cunt" and "bitch" — and requested that Grippo immediately stop this behavior.  (*Id.* ¶¶ 159-165).  According to Plaintiff, Defendants did not adequately address her complaints.  (*Id.* ¶ 166).

On or about April 29, 2009, Plaintiff filed a charge of discrimination and retaliation with the EEOC.  (*Id.* ¶ 167; Proposed SAC ¶ 168).  Thereafter, the denial of appointments and promotions continued (FAC ¶¶ 171-176), and the retaliatory conduct worsened (*id.* ¶ 178).  Specifically, Plaintiff alleges that she had offensive e-mail exchanges with senior employees; employees refused to meet with her on key issues; employees attempted "to solicit [Plaintiff's] direct reports to leave CTO"; she was denied access to certain files; and "efforts" were undertaken (by whom is not stated) to undermine her by reporting her to the Department of Investigation.  (*Id.*).  Goodwine voiced concerns to Commissioner Cosgrave; at an August 2009 meeting, he told her that she was "'driving [him] crazy.'"  (*Id.* ¶ 180).

In early 2010, Carole Post was appointed Commissioner of DoITT, and Plaintiff interviewed to be her Chief of Staff.  (*Id.* ¶¶ 182-183).  In the interview, Commissioner Post asked Goodwine why she should hire someone who has made less than favorable statements about DoITT.  (*Id.* ¶ 186).  The position went not to Goodwine but to someone less experienced (whose race and gender are not alleged in the Complaint).  (*Id.* ¶¶ 185, 188).  Similarly, Goodwine was passed over for other open positions that accompanied Post's appointment, including Senior Director of Program Management at ECTP.  (*Id.* ¶¶ 190-196).  On August 2, 2010, Plaintiff filed a supplemental EEOC charge.  (*Id.* ¶ 187).

Before filing that supplemental charge, Goodwine took Federal Medical Leave Act ("FMLA") leave, beginning in March 2010, to battle cancer.  (*Id.* ¶ 197).  She did not return to work until on or about July 18, 2011, and the circumstances of her return were rocky from the start.  (*Id.* ¶ 197; Proposed SAC ¶ 198).  On or about July 7, 2011, Goodwine received a call

from DoITT's Payroll Director stating that she could not return to work because DoITT needed to review her résumé and see where she would "'fit in.'"  (FAC ¶ 200; Proposed SAC ¶ 202). Goodwine responded that a break in service was unacceptable because it would dilute her union rights and possibly cancel her medical benefits.  (FAC ¶ 201; Proposed SAC ¶ 203).  At her request, Goodwine's union intervened and she was able to start on July 18, 2011.  (Proposed SAC ¶ 204).  In the meantime, however, Goodwine had to use several days of sick leave because her medical leave had expired on July 14, 2011.  (FAC ¶ 202; Proposed SAC ¶ 204).  A few days before she returned, a janitor was instructed to throw away Goodwine's personal belongings that were on her desk during her leave.  (FAC ¶ 210).

DoITT assigned Goodwine to the 3-1-1 Customer Service Center (the "3-1-1 CSC") upon her return.  (*Id.* ¶ 203).  Plaintiff characterizes the placement as another functional demotion, and alleges there were more suitable positions available.  (*Id.* ¶¶ 203, 207-209, 211).  Whereas at CTO she had had six subordinates, for example, at the 3-1-1 CSC she had none.  (*Id.* ¶ 212). Additionally, her new duties included taking pictures of clogged toilets and other service-related issues and opening service tickets for such issues, prompting other staff to call her "shit girl." (*Id.* ¶¶ 213-214).  Robert Whalen, DoITT's Director of General Services, insulted and threatened Plaintiff.  (*Id.* ¶ 215).  Plaintiff also alleges that Whalen instructed his staff, including Marc Austin, to intimidate and harass her.  (*Id.* ¶ 217).  Austin did so and, although Goodwine complained to DoITT senior staff, Austin's actions went unaddressed for over three months.  (*Id.* ¶ 218).  For example, on March 9, 2012, with Goodwine and another co-worker in a conference room, Austin blocked the exit "while he screamed, menaced and waved his arms in a threatening manner coming within inches of [Plaintiff's] face."  (*Id.* ¶ 219).  In a later incident, he attempted to hit Plaintiff with a metal folding chair while she was walking in the hallway.  (*Id.* ¶ 220).  And

in a third incident, he threatened to "slap a bitch" while staring at Goodwine.  (*Id.*).  When

Goodwine reported these incidents, she was told not to leave her shared office, not to walk in the

hallway, and that she might be moved to another work location.  (*Id.* ¶ 221).  Moreover, about

one month after beginning to intimidate Goodwine, Austin received a raise.  (*Id.* ¶ 223).  On or

about May 2, 2012, Goodwine filed a third supplemental charge with the EEOC.  (*Id.* ¶ 224;

Proposed SAC ¶ 225).  Finally, the Complaint summarily alleges that Plaintiff "continued to be

discriminatorily denied promotions and retaliatory [sic] compensated less than her Caucasian

male comparators until her disability retirement in February 2014."  (FAC ¶ 225).

 For reasons that are not clear from the Complaint, Plaintiff did not receive a right-to-sue

notice from the EEOC until 2015 — more than five years after she had filed her claim in April

2009.  The notice is dated January 16, 2015 (*id.* ¶ 6), which means that Plaintiff is presumed to

have received it by January 19, 2015.  *See Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525

(2d Cir. 1996) ("Normally it is assumed that a mailed document is received three days after its

mailing.").  On April 14, 2015, she filed this lawsuit.  Defendants filed a motion to dismiss the

FAC on September 16, 2016 (Docket No. 18) — briefing on which was held in abeyance

pending resolution of disputes concerning the parties' representation, after which Plaintiff

obtained new counsel.  *See Goodwine v. City of N.Y.*, No. 15-CV-2868 (JMF), 2016 WL 379761

(S.D.N.Y. Jan. 29, 2016).  Aided by new counsel, Plaintiff opposed Defendant's motion to

dismiss and, the same day, moved for leave to amend her Complaint.  (Docket Nos. 71, 72, 74).

## DEFENDANTS' MOTION TO DISMISS

 The Court begins with Defendants' motion.  In evaluating a motion to dismiss, a court

must accept all facts set forth in the complaint as true and draw all reasonable inferences in the

plaintiff's favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir.

2008) (per curiam).  A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff

alleges facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550

U.S. at 556).  A plaintiff must show "more than a sheer possibility that a defendant has acted

unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*,

550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line

from conceivable to plausible, [the] complaint must be dismissed."  *Id.* at 570.

## A.  Timeliness

As a threshold matter, Defendants contend that various claims pressed by Plaintiff are

time barred.  (Mem. Law Supp. Defs.' Mot. To Dismiss (Docket No. 19) ("Defs.' Mem.") 20-23;

Reply Mem. Law Further Supp. Defs.' Mot. To Dismiss (Docket No. 84) ("Defs.' Reply") 2-8).

The laws pursuant to which Plaintiff brings claims are governed by different statutes of

limitations (or the equivalent) and rules.  To begin, a plaintiff pursuing a claim under Title VII

must have filed an administrative complaint with the EEOC within 300 days of the alleged

unlawful employment practice — a requirement that "is analogous to a statute of limitations."

*McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir. 2006) (internal quotation marks

omitted); *see* 42 U.S.C. § 2000e-5(e); *Richardson v. Comm'n on Human Rights & Opportunities*,

532 F.3d 114, 118 (2d Cir. 2008).  That requirement does not apply to parallel claims brought

under the NYCHRL and the NYSHRL, however, which have three-year statutes of limitations

that are subject to tolling during the pendency of a plaintiff's complaint with the New York State

Department of Human Rights.  *See, e.g, Esposito v. Deutsche Bank AG*, No. 07-CV-6722 (RJS),

2008 WL 5233590, at *4-6 (S.D.N.Y. Dec. 16, 2008). Moreover, the weight of legal authority

suggests that the NYCHRL and NYSHRL statutes of limitations are also "tolled during the

period in which a complaint is filed with the EEOC." *Id.* at *5. Separately, regardless of when

(or whether) an administrative complaint is filed, "a plaintiff asserting a claim of discrimination

[or retaliation] under § 1983 must file suit within three years of the adverse employment action."

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015).[1]

The Court declines to parse how this patchwork of rules applies to Plaintiff's claims at

this stage of the litigation. For one thing, the statute of limitations is an affirmative defense for

which a defendant bears the burden of proof. *See, e.g.*, *Mosdos Chofetz Chaim, Inc. v. RBS

Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014). Accordingly, it is well established that

"a pre-answer motion to dismiss on this ground may be granted *only* if it is clear on the face of

the complaint that the statute of limitations has run." *Id.* (emphasis added) (internal quotation

marks omitted); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir.

---

[1]     Although some employment discrimination claims brought under Section 1981 are
subject to a four-year statute of limitations, *see Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369,
382-83 (2004), that longer statute of limitations is irrelevant here, as "[t]he express cause of
action for damages created by [42 U.S.C.] § 1983 constitutes the exclusive federal remedy for
violation of the rights guaranteed in § 1981 *by state governmental units*." *Jett v. Dallas Indep.
Sch. Dist.*, 491 U.S. 701, 733 (1989) (emphasis added). As the Court has already noted, because
the "Second Circuit has not yet ruled . . . in a precedential holding" whether *Jett* has been
statutorily overruled, this Court "continues to follow *Jett*." *Jeune v. City of N.Y.*, No. 11-CV-
7424 (JMF), 2014 WL 83851, at *3 (S.D.N.Y. Jan. 9, 2014); *see Howard v. City of N.Y.*, 602 F.
App'x 545, 546 n.1 (2d Cir. 2015) (recognizing the absence of Second Circuit precedent, but not
reaching the issue); *Gladwin v. Pozzi*, 403 F. App'x 603, 605 (2d Cir. 2010) (summary order)
("[Plaintiff's] § 1981 claims are encompassed by her § 1983 claims, and both are therefore
analyzed under § 1983."); *Anderson v. Conboy*, 156 F.3d 167, 178 n.19 (2d Cir. 1998) (reserving
decision on the issue); *see also Griffith v. N.Y. State Dep't of Health*, No. 14-CV-1128 (TJM),
2015 WL 4545991, at *3 (N.D.N.Y. July 28, 2015) (collecting cases following *Jett*); *Whaley v.
City Univ. of N.Y.*, 555 F. Supp. 2d 381, 401 (S.D.N.Y. 2008) (same). Accordingly, Plaintiff's
Section 1981 claims are dismissed, and the Court looks to the three-year statute of limitations
governing Section 1983 claims in New York.

2008) ("[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.").  For another, Plaintiff's claims under the NYSHRL and the NYCHRL were tolled for the five and half plus years during which her EEOC charge was pending, which means — as Plaintiff argues and Defendants do not dispute (*see* Mem. Law Supp. Pl.'s Opp'n Defs.' Mot. To Dismiss (Docket No. 71) ("Pl.'s Opp'n") 23-24; Defs.' Reply 2-8) — that those claims reach most, if not all, of the conduct alleged in the Complaint.  *See Esposito*, 2008 WL 5233590, at *5; *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) (noting that untimely acts may be admissible as evidence in support of timely claims).  In light of that, there is little or nothing gained at this stage of the litigation by deciding what the relevant cut off dates are for Plaintiff's federal claims and whether or to what extent the Lily Ledbetter Act and the "continuing violation" doctrine apply, as Plaintiff contends.  (Pl.'s Opp'n 21-27).  The Court will presumably need to resolve those issues before trial as they would affect what the jury is asked to decide and may affect the evidence admissible at trial.  But resolving them at this stage will have no bearing on the scope of discovery.  Accordingly, Defendants' arguments about the timeliness of Plaintiff's claims are rejected, but without prejudice to renewal on a more complete record at summary judgment.

## B.  Retaliation

Turning to the merits, the Court begins with Plaintiff's central claims — for retaliation. To establish a *prima facie* case of unlawful retaliation under Title VII, Section 1983, and the NYSHRL, "an employee must show that (1) he [or she] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (internal

quotation marks omitted); *see also Vega*, 801 F.3d at 91 ("As in discrimination claims, the

elements of a retaliation claim based on an equal protection violation under § 1983 mirror those

under Title VII."); *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10,

14 (2d Cir. 2013) ("The standards for evaluating . . . retaliation claims are identical under Title

VII and the NYSHRL.").  Although the standard for pleading a NYCHRL retaliation claim is

"similar to the anti-retaliation standard under Title VII" — *i.e.*, a plaintiff must allege the

existence of a protected activity, an "employment action disadvantaging [him or] her," and a

causal connection between the two — "New York courts have emphasized that the standard

under the NYCHRL is broader." *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 332 (S.D.N.Y.

2010) (internal quotation marks omitted) (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d

27, 34 n.12 (App. Div. 1st Dep't 2009)).  It follows that, if a plaintiff states a claim under Title

VII and the NYSHRL, the claim "necessarily survives under the more liberal standard of

NYCHRL as well."  *Anderson v. City of N.Y.*, No. 06-CV-5726 (RRM) (RER), 2012 WL

6720694, at *7 (E.D.N.Y. Dec. 27, 2012); *see also Armstrong v. Metro. Transp. Auth.*, No. 07-

CV-3561 (DAB), 2015 WL 992737, at *6 (S.D.N.Y. Mar. 3, 2015) (denying motion for

summary judgment with respect to the plaintiff's NYCHRL claims that also survived under Title

VII, "[b]ecause 'federal and state civil rights laws are a floor below which the City's Human

Rights law cannot fall'" (quoting N.Y.C. Local Law No. 85, § 1 (2005))).[2]

---

[2]      As noted, Plaintiff also brings claims pursuant to Section 1983, contending that
Defendants violated her equal protection rights.  (FAC ¶¶ 246-254, 276-278).  The Court need
not — and does not — analyze those claims separately here, as the relevant standards are
effectively the same.  *See, e.g.*, *Vega*, 801 F.3d at 91.  The Court notes, however, that before a
defendant can be held liable under Section 1983 (or, for that matter, under the NYSHRL and
NYCHRL), a plaintiff must show that the defendant "*actually participate[d]* in the conduct
giving rise to" the claim.  *Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004) (emphasis
added) (internal quotation marks omitted).  Plaintiff may not be able to prove the requisite
personal involvement of each Individual Defendant, but because Defendants only move to

Applying those standards here, Plaintiff's claims are sufficient to survive Defendants'

motion (except, as Plaintiff herself concedes (FAC ¶ 42 n.5), to the extent that she purports to

bring Title VII claims against the Individual Defendants, as there is no individual liability under

Title VII, *see, e.g.*, *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) (per curiam)).

According to the Complaint, Plaintiff complained — formally and informally — about alleged

discrimination and retaliation throughout her tenure at DoITT.  (*See* FAC ¶¶ 81, 92-94, 116, 167,

187, 221, 224; *see also* Proposed SAC ¶¶ 157, 200, 227-230).  That activity was plainly

"protected," *see Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175 (2d Cir. 2005); *Sumner v.

U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990), and Defendants were plainly aware of it, *see

Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (requiring nothing more than

"general corporate knowledge").  Further, Plaintiff identifies several employment actions that

could qualify as materially adverse — defined as an action that "could well dissuade a

reasonable worker from making or supporting a charge of discrimination,'" *Burlington N. &

Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) — and that are plausibly connected to her

protected activity.  Those include Schachter's allegedly harassing treatment of her in 2006-2007,

the downgrading of her job responsibilities, and her transfer to CTO, all of which began almost

immediately after she complained about alleged discrimination.  (*See* FAC ¶¶ 95-104).  *See, e.g.*,

*Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554-55 (2d Cir.

2001) (holding that five months between a protected activity and an adverse action can suffice to

establish a causal connection between the two).  They also include Commissioner Post's

rejection of Plaintiff's application to be Chief of Staff, given that she gave the job to a less

---

dismiss Plaintiff's claims in their entirety and do not differentiate among the Individual
Defendants, the Court declines to parse Plaintiff's Complaint to determine if her claims should
be dismissed as to some Individual Defendants.

experienced candidate and explicitly asked why she should give the position to someone who had been critical of DoITT — which may well have been a reference to Plaintiff's complaints of discrimination and retaliation.  (*See* FAC ¶¶ 185-188).  Those allegations are more than sufficient to establish a *prima facie* case of retaliation at this stage of the litigation.

## C.  Discrimination

Plaintiff also alleges that she was the victim of discrimination on the basis of sex and race.  More specifically, she brings discrimination claims under Title VII, Section 1983, the NYSHRL, and the NYCHRL pursuant to two different legal theories: disparate treatment and hostile work environment.  (*See* Pl.'s Opp'n 33-38).[3]  The Court addresses each in turn.

### 1.  Disparate Treatment.

Discrimination claims under Title VII, Section 1983, the NYSHRL, and the NYCHRL are analyzed under the three-step burden-shifting scheme adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Nieblas-Love v. N.Y.C. Hous. Auth.*, — F. Supp. 3d —, 2016 WL 796845, at *3 (S.D.N.Y. Feb. 26, 2016).[4]  Significantly, however, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination"; instead, "[t]hey need only give plausible support to a minimal inference of

---

[3]     Plaintiff brings her discrimination claims under the NYSHRL, the NYCHRL, and Section 1983 against *all* Defendants, whereas she brings her discrimination claims under Title VII against only the City and DoITT.  (*See* FAC ¶¶ 255-278).

[4]     Although it is "unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis" applies to NYCHRL claims, *Mihalik v. Credit Agricole Cheuvreux N. Am. Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013), courts in the Second Circuit generally apply the "liberal standards [of the NYCHRL] to the basic *McDonnell Douglas* framework," *Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217 (RJS) (JLC), 2013 WL 6231615, at *15 (S.D.N.Y. Dec. 2, 2013) (collecting cases).

discriminatory motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). Under

that standard, a plaintiff can survive a motion to dismiss if she alleges "(1) that she is a member

of a protected class, (2) that she was qualified for the position . . . , (3) that she suffered an

adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an

inference of discriminatory motivation." *Id.* With respect to the third element, an adverse

employment action "is more disruptive than a mere inconvenience or an alteration of job

responsibilities[,] and can include termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices unique to a particular situation." *Leibowitz*

*v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks omitted). With

respect to the fourth element, the fact that "someone outside the protected class" was chosen over

a plaintiff "will ordinarily suffice for the required inference of discrimination at the initial *prima*

*facie* stage of the Title VII analysis, including at the pleading stage." *Littlejohn*, 795 F.3d at 313.

   Plaintiff's Complaint meets those lenient standards. Plaintiff generally alleges that,

despite her superior qualifications, she was repeatedly passed over for job vacancies or

promotions in favor of predominantly white, predominantly male applicants. (*See* Pl.'s Opp'n

33-36). Most substantially, Plaintiff alleges that, in July 2008, after an "overtly hostile"

interview for a job at ETCP, the position was given to a less qualified white man, who declined

it; moreover, the ETCP supervisor then told Plaintiff not to re-apply because, while he knew she

was qualified, she would not "fit in." (FAC ¶¶ 137-141).[5] That is more than sufficient to state a

---

[5]    It is true, as Defendants note (Defs.' Mem. 28), that that position was ultimately filled by
another African-American woman. But, according to the Complaint, that woman resigned
shortly thereafter because, in her words, she did not "fit in." (FAC ¶ 146). When viewed in
conjunction with the fact that Plaintiff was told that she would not "fit in," that allegation
arguably bolsters Plaintiff's claims of sex- and race-discrimination. *Cf. Schuette v. Coal. to*

claim for race and gender discrimination.  *See Mauro v. S. New England Telecomms., Inc.*, 208 F.3d 384, 386 (2d Cir. 2000) (stating that for a failure-to-promote discrimination claim, a plaintiff must show that she is a member of a protected class, that she was qualified for the position, that she applied and was rejected, and that "the employer kept the position open and continued to seek applicants"); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995) (stating that to show gender discrimination in the context of a termination, "a [discharged] female plaintiff must show that she was qualified for the position . . . and that the employer sought or hired a male to replace her").  Plaintiff also states a claim for race discrimination with respect to her failed application for the ETCP Senior Director of Program Management, as she alleges that Defendants gave the position to a less qualified white woman in a process that violated internal protocols.  (FAC ¶¶ 190-193).[6]

### 2. Hostile Work Environment

By contrast, Goodwine's hostile work environment claims fail as a matter of law.  To prevail on such a claim under Title VII or the NYSHRL — which are governed by the same standards, *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998) — a plaintiff must show that his or her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Redd v. N.Y. Div. of Parole*, 678 F.3d

---

*Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. By Any Means Necessary (BAMN)*, 134 S. Ct. 1623, 1676 (2014) (Sotomayor, J., dissenting) ("Race matters because of . . . that most crippling of thoughts: 'I do not belong here.'").

[6]      By contrast, Plaintiff simply lists other positions for which she unsuccessfully applied. (*See, e.g.*, FAC ¶¶ 151-156, 190, 194).  Light on details, these other allegations standing alone would not have been sufficient to sustain Plaintiff's claims of disparate treatment.  But, as discussed, Plaintiff's allegations with respect to the July 2008 interview and the March 2010 hiring are sufficient, and the allegations of other incidents may be relevant to those claims.

166, 175 (2d Cir. 2012) (internal quotation marks and alteration omitted).  The laws do not reach "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex"; instead, they forbid "only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  Thus, "courts must distinguish between merely offensive or boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment," *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001) (internal quotation marks omitted), based on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  For "comments, slurs, and jokes to constitute a hostile work environment, . . . there must be a steady barrage of opprobrious racial [or sexual] comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks omitted); *accord Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).

In her memorandum of law, Plaintiff defends her hostile work environment claims in only a cursory manner.  (Pl.'s Opp'n 37).  As a result, it is not clear exactly which alleged actions, occurring at what time, Plaintiff believes altered the conditions of her employment, but she appears to base her claims on: (1) the period during which she worked for Schachter (FAC ¶¶ 64-95); (2) various acts involving Grippo and others around February 2009 (*id.* ¶¶ 157-166); and (3) the issues with her assignment to the 3-1-1 CSC and her dealings with Whalen and Austin (*id.* ¶¶ 200-227).  (*See* Pl.'s Opp'n 37).[7]  Notably, however, that allegedly harassing

---

[7]     Plaintiff also points to certain acts that occurred in the wake of her EEOC charges (Pl.'s Opp'n 37), but the Complaint itself describes those acts as "*retaliatory* conduct."  (*See* FAC ¶¶ 178-181 (emphasis added)).  Accordingly, the Court does not consider them here.

conduct covers a period of almost five years, during which Plaintiff worked not only in different positions, but also in three wholly different programs and offices: ETCP, CTO, and the 3-1-1 CSC.  That is all but fatal to Plaintiff's federal and state claims.  *Cf. Dziedzic v. State Univ. of N.Y. at Oswego*, — F. App'x —, 2016 WL 2620305, at *1 (2d Cir. May 9, 2016) (summary order) (concluding that an alleged harassing act "made by different co-workers in a different section of the . . . department" was not part of the same hostile work environment as the other harassing acts alleged).

Even viewing the conduct as all relating to a single "work environment," however, Plaintiff fails to state hostile work environment claims under Title VII and the NYSHRL.  First and foremost, virtually all of the allegedly harassing acts were "sex-neutral" and race-neutral "on their face."  *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).  Plaintiff does allege certain comments with arguably racial or gender overtones — for example, that she was referred to as a "cunt" and "bitch" by a manager (FAC ¶ 163), that she was once asked rhetorically if she was "smoking crack" (a comment that she perceived to be racial) (*id.* ¶ 161), and that she was referred to as "shit girl" because of her duties relating to clogged toilets at the 3-1-1 CSC (*id.* ¶ 214).  But Plaintiff fails to show that such comments — spanning her eight-year tenure at DoITT — were anything more than "isolated acts, [which] do not meet the threshold of severity or pervasiveness" required to state a hostile work environment claim.  *Alfano*, 294 F.3d at 373-74 (citing cases); *accord Schwapp*, 118 F.3d at 110-11; *see, e.g.*, *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir. 1998) (holding that a supervisor's occasional racist remarks "fail[ed] to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile environment").

Nor does Schachter's allegedly harassing conduct suffice to create an actionable hostile work environment, as — conclusory assertions aside, *see, e.g.*, *Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012) (summary order) ("A court must first ignore mere conclusory statements . . . ." (internal quotation marks omitted)) — there is nothing in the Complaint to suggest that his conduct was based on Plaintiff's race or sex.  *See, e.g.*, *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118-19 (2d Cir. 2010) (summary order) (holding that hostile acts "not facially related" to a protected characteristic — such as "wrongly exclud[ing] [the plaintiff] from meetings, excessively criticiz[ing] her work, refus[ing] to answer work-related questions, arbitrarily impos[ing] duties outside of her responsibilities, thr[owing] books, and sen[ding] rude emails" — are insufficient, even alongside a racist remark).  And while Plaintiff's allegations of her treatment at the 3-1-1 CSC are disturbing — especially the threatening and violent behavior of Austin (who is not a defendant in this case) — the alleged connections between that treatment and Plaintiff's race or sex likewise range from negligible (his using the word "bitch" in the third incident) to nonexistent (the first two incidents).  *See, e.g.*, *La Marco v. N.Y. State Nurses Ass'n*, 118 F. Supp. 2d 310, 317-18 (N.D.N.Y 2000) (use of "bitch," with other gender-neutral offensive conduct, is not enough to show hostility is gender-based).

Although she comes closer, Plaintiff also fails to state a hostile work environment claim under the NYCHRL.  The NYCHRL "does not require either materially adverse employment actions or severe and pervasive conduct," but it still requires that any such allegedly "unequal treatment" be "*based on* gender [or race].""  *Mihalik v. Credit Agricole Cheuvreux N. Am. Inc.*, 715 F.3d 102, 114 (2d Cir. 2013) (emphasis added) (internal quotation marks omitted); *Harris v. NYU Langone Med. Ctr.,* No. 12–CV–0454 (RA)(JLC), 2013 WL 3487032, at *27 (S.D .N.Y. July 9, 2013) (noting that even under the NYCHRL, a plaintiff must "plead facts tending to show

that actions that created the hostile work environment were taken against him because of a prohibited factor" and that "the broader remediation available under the City law does not allow the Plaintiff to dispense with linking his claim of hostility to some attitude that the law forbids" (internal quotation marks omitted)), *report and recommendation adopted by* No. 12-CV-0454 (RA)(JLC), 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013); *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 588 (S.D.N.Y. 2011) (similar).  Plaintiff fails to plausibly allege that any acts of hostility "by her colleagues were on the basis of her sex or any other protected characteristic." *Nunez v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 14-CV-6647 (JMF), 2015 WL 4605684, at *16 (S.D.N.Y. July 31, 2015).  Specifically, Plaintiff fails to allege, nor even really argue, that the stray remarks using nominally gendered or racial language had a discriminatory motive or "signal[ed] views about the role of women [or minorities] in the workplace."  *Mihalik*, 715 F.3d at 111 (internal quotation marks omitted); *cf. Marshall v. Kingsborough Cmty. Coll. of CUNY*, No. 11-CV-2686 (PKC)(RML), 2015 WL 5773748, at *12 (E.D.N.Y. July 27, 2015) (finding NYCHRL standard met when the plaintiff's boss "referred to her and other female employees by such gendered slurs as 'cunt' and 'bitch' on a regular basis and said that 'women don't belong in the workplace'"), *report and recommendation adopted by* No. 11-CV-2686 (PKC)(RML), 2015 WL 5774269 (E.D.N.Y. Sept. 30, 2015).  Such language may be uncivil, but the NYCHRL, like Title VII and the NYSHRL, does not "operate as a general civility code." *Nelson v. HSBC Bank USA*, 929 N.Y.S.2d 259, 264 (App. Div., 2d Dep't 2011) (internal quotation marks omitted); *see Mihalik*, 715 F.3d at 110 ("When applying this standard, however, district courts must be mindful that the NYCHRL is not a 'general civility code.'  The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." (quoting

*Williams*, 872 N.Y.S.2d at 41) (citations omitted)).  Accordingly, Plaintiff's hostile work

environment claims are dismissed.

**D.  *Monell* Liability**

With respect to Plaintiff's *Monell* claims, it is well established that a plaintiff cannot

prevail on a Section 1983 claim against a municipality (or municipal agency, such as DoITT)

unless the alleged violation was "caused by a custom or policy within the meaning of *Monell* and

subsequent cases."  *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) (discussing

*Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  Thus, to recover from the City or

DoITT pursuant to Section 1983, Plaintiff must show: "(1) actions taken under color of law; (2)

deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an

official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*,

542 F.3d 31, 36 (2d Cir. 2008).  Official municipal policy "includes the decisions of a

government's lawmakers, the acts of its policymaking officials, and practices so persistent and

widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61

(2011).  Here, Plaintiff's allegations are sufficient to meet this test.  As shown above, Plaintiff

has stated actionable claims for discrimination and retaliation, including under Section 1983.

And with respect to a pattern and practice of such conduct at DoITT, Plaintiff not only makes

general allegations regarding their existence, but she supports her allegations with statistics and

specific examples of other employees who allegedly suffered similar discrimination and

retaliation.  (*See* FAC ¶¶ 118-123, 168-170, 178, 228-230; Proposed SAC ¶¶ 227-229).  Taken

together, that is enough.  *See, e.g.*, *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 872 (2d Cir.

1992) ("We might agree with the district court that [plaintiff] would have fallen short in her

proof if the [statistical evidence] had been her only evidence of a departmental practice of gender

discrimination.  However, [plaintiff] presented ample facts concerning her treatment at the hands

of her superiors from which the jury, in conjunction with the statistical evidence, could have

reasonably inferred that there was a custom of sex bias operating within the NYPD and

governing its disciplinary decisions." (internal citation omitted)); *Hardy v. Town of Greenwich*,

No. 3:06-CV-833 (MRK), 2008 WL 5117370, at *5 (D. Conn. Dec. 3, 2008) (Kravitz, J.)

(stating, in a summary judgment ruling, that "viewing the totality of Plaintiffs' evidence — the

statistical evidence, the complaints to the EEO office, the allegations of a long-standing and

allegedly well-known hostile work environment, coupled with numerous alleged discrete

instances of discrimination — the Court cannot conclude that [the *Monell* claim] fails as a matter

of law").

## PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

Finally, the Court addresses Plaintiff's motion to amend her Complaint pursuant to Rule

15(a)(2) of the Federal Rules of Civil Procedure.  The Second Circuit has held that a Rule 15(a)

motion "should be denied only for such reasons as undue delay, bad faith, futility of the

amendment, and perhaps most important, the resulting prejudice to the opposing party." *Aetna*

*Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005) (internal quotation

marks omitted); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d

160, 190 (2d Cir. 2015) ("leav[ing] unaltered" prior case law on denial of leave to amend,

including the rule that "leave may be denied where amendment would be futile").  Here, Plaintiff

proposes largely stylistic and organizational edits to her allegations that, in general, merely help

clarify her claims, and there is no indication that these edits are either futile or prejudicial to

Defendants; indeed, Defendants' briefing even makes use (albeit without citation) of the more

specific dates used in the Proposed SAC.  (*See, e.g.*, Defs.' Mem. 23).  Yet Plaintiff also

proposes adding a new cause of action under Section 1983 for First Amendment retaliation, which Defendants oppose on the ground of futility.  (Defs.' Feb. 29, 2016 Ltr. (Docket No. 80) 2-4).  An amendment is "futile" if it could not withstand a motion to dismiss under Rule 12(b)(6).  *See, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir.2012). The question, therefore, is whether the Proposed SAC states a claim for First Amendment retaliation.

"To prove that a public employer unlawfully retaliated against an employee for their speech in violation of the First Amendment, the plaintiff must show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he or she suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action."  *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129-30 (2d Cir. 2013) (per curiam) (internal quotation marks, alterations, and citations omitted).  Applying those standards here, Plaintiff's proposed allegations fail to state a plausible claim for First Amendment retaliation.  Plaintiff rightly contends that her public speech against discrimination and retaliation at DoITT — namely, her letter to two New York City council members in March 2012 and her participation in a meeting with council members in May 2012 (Proposed SAC ¶ 229) — is protected by the First Amendment.  (Mem. Law Supp. Pl.'s Mot. Leave To File SAC (Docket No. 76) 4; Pl.'s Mar. 9, 2016 Ltr. (Docket No. 83) 2-3).  *See, e.g.*, *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) (reaffirming that "discrimination in a government workplace is a matter of public concern").  But Plaintiff's Proposed SAC fails to allege any adverse employment actions that were plausibly motivated by that protected speech.  The final purportedly adverse act properly pleaded by Plaintiff concerns Austin's harassment at the 3-1-1

CSC, which appears to have occurred sometime after March 19, 2012, but prior to May 2, 2012. Yet the Proposed SAC fails to allege that Austin was aware of Plaintiff's letter of March 2012, let alone that his actions were motivated by it; and the same is true of the May meeting, which most likely occurred *after* Austin's allegedly harassing acts.  Accordingly, leave to amend the Complaint to add a First Amendment retaliation claim is denied on the ground of futility, but Plaintiff's motion to amend the Complaint is otherwise granted.  *See, e.g.*, *Crosland v. City of N.Y.*, 140 F. Supp. 2d 300, 311 (S.D.N.Y. 2001) (dismissing a First Amendment retaliation claim where the plaintiff "presented no evidence from which to reasonably infer that [the allegedly retaliatory] actions are in any way causally connected to his protected speech"), *aff'd sub nom. Crosland v. Safir*, 54 F. App'x 504 (2d Cir. 2002).

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss and Plaintiff's motion to amend the complaint are both GRANTED in part and DENIED in part.  Specifically, Plaintiff's Section 1981 claims are dismissed, her Title VII retaliation claims against the Individual Defendants are dismissed, her hostile work environment claims are dismissed, and leave to add a First Amendment retaliation claim is denied.  Otherwise, the Complaint and its claims survive, and Plaintiff is granted leave to make her proposed amendments.  Plaintiff is directed to file the second amended complaint ("SAC") within two days from the date of this Opinion and Order, and Defendants are directed to answer the SAC (although they may ignore the claims that the Court has dismissed or denied leave to add) within three weeks of its filing.  Finally, the parties shall appear for an initial pretrial conference with the Court on **June 29, 2016**, at **4:15 p.m.** in **Courtroom 1105** of the **Thurgood Marshall United States Courthouse, 40 Centre Street, New York, New York**.  In accordance with the Notice of Initial Pretrial Conference (Docket No.

23), the parties shall file a joint letter and proposed Case Management Plan no later than the

Thursday before the conference.

     The Clerk of Court is directed to terminate Docket Nos. 18, 74, 87.


     SO ORDERED.

Date:  May 23, 2016  
       New York, New York

                                  JESSE M. FURMAN  
                          United States District Judge